**FIRST MISSISSIPPI CORPORATION,**
Plaintiff,

v.

**FIELDER TOWING CO., INC.,** Warfield Towing Service, Inc., and Greenville River Services, Inc., in personam and M/V **JENNIFER CUMMINS,** her engine, boilers, tackle, etc., in rem, Defendants.

No. GC 75–57–S.

United States District Court,
N. D. Mississippi,
Greenville Division.

Feb. 7, 1979.

James L. Robertson, Campbell & DeLong, Greenville, Miss., John B. Gooch, Jr., Montgomery, Barnett, Brown & Read, New Orleans, La., for plaintiff.

Wm. G. Beanland, Brunini, Everett, Beanland & Wheeless, Vicksburg, Miss., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ORMA R. SMITH, District Judge.

The findings of fact and conclusions of law on the issue of liability adopted by the court after a non-jury trial and final submission by the parties, are hereafter set forth.

### A. *Findings of Fact.*

1. Plaintiff, First Mississippi Corporation (hereafter "plaintiff"), is a corporation organized, chartered and existing under the laws of the State of Mississippi, having its principal place of business in Jackson, Mississippi.

2. Fielder Towing Co., Inc. (hereafter "Fielder"), is a corporation organized, chartered and existing under the laws of the State of Mississippi, having its principal place of business in Greenville, Mississippi.

3. In May and June of 1973, the M/V JENNIFER CUMMINS (hereafter "tug") was a documented vessel of the United States, Official No. 293792, whose home port was Greenville, Mississippi.

4. In May and June of 1973, the tug was owned by Fielder, one of the defendants herein.

5. In May and June of 1973, the tug was operated by Warfield Towing Services, Inc. (hereafter "Warfield") one of the defendants herein, pursuant to a charter arrangement between Fielder and Warfield.

6. In May and June of 1973, plaintiff operated and controlled the Barge EBI–126 (hereafter "barge") under charter from Estes Barge Leasing, Inc., its owner.

7. The barge is a steel hopper barge, the dimensions of which are 195 feet in length, 35 feet in breadth, and 12 feet in depth. The barge has a raked bow and a square stern.

8. The last survey or inspection of the barge made by an independent surveyor prior to the events involved in this action took place on May 15 and 17, 1973, at premises owned or operated by Southern Shipbuilding Company in Slidell, Louisiana.

9. Following the aforesaid survey, the barge was in a satisfactory and seaworthy condition and was reasonably fit for the transportation of bulk products on the inland waterways of the United States.

10. On May 23, 1973, and immediately prior thereto, plaintiff was the owner of a cargo of 45% grade urea, being approximately 1,184.47 short tons by weight.

11. On May 23, 1973, the aforesaid cargo of urea was loaded into the barge at Donaldsonville, Louisiana.

12. On or about May 23, 1973, the aforesaid cargo of urea and the barge were inspected by W. E. Saybolt & Co., Inc. On May 24, 1973, W. E. Saybolt & Co., Inc., issued its inspection report which accurately set forth various data, including freeboard, tonnage, times and other measurements, which were correct and in fact existed with respect to the aforesaid cargo of urea and the barge on the dates indicated.

13. On or about June 1, 1973, between 10:00 and 10:15 A.M. the barge was placed in the tow of the M/V HARRIET ANN at approximately Mile 170, Lower Mississippi River.

14. In May and June of 1973, the M/V HARRIET ANN was a documented vessel of the United States which was owned and/or operated by Upper Mississippi Towing Corporation whose principal place of business is located at 7703 Normandale Road, Minneapolis, Minnesota 55435.

15. The M/V Harriet Ann transported the loaded barge from approximately Mile 170 on the Lower Mississippi upriver to approximately Mile 600 on the Lower Mississippi River.

16. At approximately 6:00 P.M. on June 5, 1973, the M/V HARRIET ANN delivered the loaded barge to the White River Fleet at or near Mile 600, Lower Mississippi River.

17. The White River Fleet, in May and June of 1973, was owned and operated by Greenville River Services, Inc. One of the vessels used by said owner and operator at the fleet was the M/V BETTY LENSING.

18. Immediately following receipt of the loaded barge into its fleet on June 5, 1973, Greenville River Services, Inc. had its personnel inspect the barge to determine whether there were any dangerous, defective or unseaworthy conditions existing thereon. No such conditions were found.

19. Between approximately 6:00 P.M. on June 5, 1973, and approximately 6:30 P.M. on June 6, 1973, the loaded barge was within the exclusive custody and control of Greenville River Services, Inc.

20. Between the time when the loaded barge was received into the White River Fleet until the time it was delivered to the tug, plaintiff had no personnel on the barge or at the fleet.

21. Greenville River Services, Inc. neither made nor caused to be made any report to plaintiff in any way indicating the exist-

ence of any defective or unseaworthy condition on the barge which would in any way constitute a hazard or danger to the barge or the cargo of urea loaded therein.

22. Between approximately 6:00 P.M. on June 5, 1973, and approximately 6:30 P.M. on June 6, 1973, Greenville River Services, Inc. personnel made periodic inspections of the wing tanks and rake of the barge and the barge was found to be in a reasonably safe, watertight, and seaworthy condition at all times, and no evidence of leakage was found in the skin of the barge.

23. On or about June 6, 1973, at approximately 6:30 P.M. the barge was taken out of the White River Fleet and placed in the tow of the tug which was at the time owned and operated by Fielder.

24. The crew of the M/V BETTY LENSING, the fleet tug, inspected the barge at approximately 6:30 P.M. prior to delivery of the barge to the tug on June 6, 1973, and found no change in the barge. In fact, the barge at that time was found to be in a safe, watertight and seaworthy condition. The barge was in substantially the same condition at that time as it was when the barge had been delivered to the White River Fleet.

25. The barge was delivered and accepted into the tow of the tug in substantially the same condition as it was in when the barge was accepted by Greenville River Services, Inc., at its White River Fleet.[1]

26. Between approximately 6:30 P.M. on June 6, 1973, until approximately 4:30 P.M. on June 7, 1973, the loaded barge was within the exclusive custody and control of Fielder and the tug.

27. The tug pushed the barge to Friars Point and tied it off to shore wires several hundred yards above the Mississippi Lime Company dock at approximately 4:30 P.M. on June 7, 1973.

28. On the morning of June 8, 1973, the M/V SALLE ESTELLE picked up the load-

---

1. The above and foregoing findings are justified by the record and particularly by stipulation entered into by the parties and filed with the clerk. A copy of the stipulation is attached as an appendix.

ed barge still affixed to the shore wires and moved ·it several hundred yards downriver and spotted it at the crane barge or unloading dock at the Mississippi Lime Company facilities at Friars Point, Mississippi.

29. Upon the delivery of the barge to the Mississippi Lime Company dock the hatch covers of the barge were opened and it was discovered that the cargo was wet and in a substantially damaged condition.

30. On Saturday, June 9, 1973, Jim Smith, Marine Surveyor, acting on behalf of Hull and Cargo Surveyors, Inc., inspected the barge and its cargo of 45% grade urea. Mr. Smith is the same surveyor who had inspected the barge on May 17, 1973.

31. Upon inspection, Surveyor Smith and others found that the No. 1 and No. 2, port and starboard wing tanks, and the forward rake of the loaded barge had been holed. As a result of said damage to the barge, water had entered the cargo compartment and damaged plaintiff's cargo.

32. Between the White River Fleet located at approximately Mile 600, L.M.R. and Friars Point, Mississippi, located at approximately Mile 650, L.M.R., there are between thirty-five and forty fixed rock dikes.

33. Captain James Simpson was the only crew member of the tug who testified at trial. Captain Simpson was not on duty during the entire trip from White River Fleet to Friars Point. Captain Simpson was asleep during a portion of the time he was not on duty.

34. On June 6–7, 1973, high water conditions prevailed between White River Fleet and Friars Point, resulting in the tops of the dikes being covered by water and not visible to the naked eye.

35. While in transit from the White River Fleet to Friars Point and while in the tow of the tug, the loaded barge was drawing approximately nine feet of water, that is, the bottom of the barge was approximately nine feet deep in the water.

36. Between the shore wires where the loaded barge had been tied off by the tug, and the point where the barge was spotted for unloading, there are no dikes, revetments or other hard fixed objects capable of holing a barge. Rather, this area was in June of 1973 a mud bank with a few willows.

37. The movement of the loaded barge by the M/V SALLE ESTELLE was completely uneventful. The barge struck no hard fixed object of any kind.

38. At the time the loaded barge was placed in the tow of the tug, the barge was in a safe, watertight and seaworthy condition. When delivered to the unloading dock of the Mississippi Lime Company facilities at Friars Point, there were six holes in the bottom of the bow rake and forward wing tanks of the barge.

39. During the movement of the barge from Donaldsville, Louisiana to the White River Fleet, from the White River Fleet to the mooring place at Friars Point and from the place of mooring to the unloading dock at Friars Point, the barge did not have a noticeable list. The stipulated facts and the evidence in its entirety convinces the court that the tears or holes in the bottom of the bow rake and wing tanks were made during the movement of the barge from the White River Fleet to the place where the barge was moored near Friars Point. The tug was adequately crewed and staffed for the purpose of conducting a one-barge tow upstream a distance of 48 miles under the flood conditions existing on the occasion of the movement of the barge.

40. The only member of the crew to testify was Captain Simpson. The log of the tug was not introduced in evidence nor was it available at the trial. Captain Simpson testified that he was not on duty the entire trip. He was relieved on occasions in the wheelhouse by the pilot, and slept during a portion of the time. He testified that he was a light sleeper and voiced the opinion that the striking by the barge of some fixed object would have awakened him. This testimony has been considered but the court is not satisfied that the striking of some object, not necessarily a fixed object, would necessarily have awakened him.

41. The nature and characteristics of the tears and holes in the bottom of the bow rake and wing tanks are such as would probably have occurred had the barge come into contact with some hard object or objects in the movement upriver.

42. The evidence before the court reflects that at the time of the movement of the barge upriver the stage of the river was such that the tops of the stone dikes along the route of the tug and its tow during the voyage were submerged not less than seventeen (17) feet. The holes or tears which existed in the barge on its delivery at Friars Point were of the type that one would reasonably conclude they were caused by the barge moving over the dikes and scraping or coming into contact with them. The uncontradicted evidence shows that the dikes were so deeply submerged in the river as to render impossible such an occurrence.

43. The evidence does not affirmatively reflect any reason for the holing of the barge while in the tow of the tug.

### B. *Conclusions of Law.*

1. This court is vested with jurisdiction of this case in admiralty and venue is properly laid in the Northern District of Mississippi, Greenville Division.

■ 2. The tug was not an insurer of its tow and it was not liable as a common carrier. The tug owed plaintiff "the duty to exercise such reasonable care and maritime skill as prudent navigators employ for the performance of similar service. The burden was upon [plaintiff] to show that the loss for which [it seeks] recovery was caused by a breach of that duty. The mere fact that the [barge] was in good order when received by [the tug] and in damaged condition when delivered does not raise any presumption of fault." *Stevens v. The White City*, 285 U.S. 195, 202, 52 S.Ct. 347, 350, 76 L.Ed. 699, 703 (1932); *Bisso v. Waterways Transportation Company*, 235 F.2d 741 (5th Cir. 1956); *Security Barge Lines v. Cargo Carriers, Inc.*, (N.D.Miss. 1973, unreported decision, Keady, C. J., in Cause No. GC 71–51–K.)

■ 3. The contract in the action sub judice imposed upon the tug the duty of due care and cast upon the barge the burden of establishing negligence. The tears or holes in the bottom of the wing tanks and bow rake of the barge, noticed for the first time upon delivery, were not such as would ordinarily have occurred in the movement of the barge. The tug is under the obligation to make some satisfactory explanation. *Bisso v. Waterways Transportation Company, supra; Simkins v. R. L. Morrison & Sons*, 107 F.2d 121 (5th Cir. 1939). In *Simkins*, the court said:

It is elementary that a tug does not have the liability of a common carrier or an insurer but is required to use ordinary care and prudence in performing the services. When an accident occurs to the tow the action is ex delicto and the burden is on the tow to show negligence on the part of the tug. However, circumstances may create a strong presumption of negligence. In that event the burden is on the tug to rebut the prima facie case or, at least, to show a reasonable excuse for the accident other than its own negligence.

107 F.2d at 122.

■ 4. The parties did not introduce any evidence from which the court could make a finding as to the cause of the holes or tears in the barge. The parties stipulated that the barge, when received by the tug, was in the same condition as when accepted by Greenville River Services, Inc., at its White River Fleet, at which time the barge was inspected by the crew of the M/V BETTY LENSING (operated by Greenville River Services, Inc.) and accepted as a barge reasonably safe and in a seaworthy condition. This stipulation, however, did not refer to the integrity of the bulkhead or floor of the cargo compartment of the barge. The court concludes, based upon this stipulation, that the holes or tears which were found in the bottom of the rake bow and wing tanks of the barge were non-existent when the barge was placed in the tow of the tug. It necessarily follows that the holes or tears appearing in the

barge upon delivery were sustained on the voyage while in the care of the tug.

■ The court recognizes and adopts the rule that the mere fact that a barge is in good order when received and in a damaged condition when delivered does not raise any presumption of fault. *Stevens v. The White City*, 285 U.S. 195, 202, 52 S.Ct. 347, 76 L.Ed. 699 (1932).

■ The court also recognizes the rule, approved by the Fifth Circuit in a number of cases, that while the burden is on the tow to show negligence on the part of the tug, special circumstances may create a strong presumption of negligence, in which event the burden is on the tug to rebut the prima facie case, or, at least to show a reasonable excuse for the accident other than its own negligence. *Bisso v. Waterways Transportation Company*, 235 F.2d 741, 744 (5th Cir. 1956). *Simkins v. R. L. Morrison & Sons, supra.*

Accepting as correct the finding that the holes or tears in the barge did not exist when the bar was taken into the tow of the tug, it is obvious that they could not have been inflicted on the barge absent negligence of the tug. It was the duty of the tug to come forward with some reasonable explanation as to the manner in which the holes or tears were sustained by the barge. This was not done by the tug. The only member of the crew who testified was the captain, and the tug's log was not produced. The court concludes that the tug failed in its duty to offer a reasonable explanation which would exonerate it from negligence.

■ 5. The water entered the wing tanks and bow rake during the movement upriver and was detected when unloading operations were commenced. When the cargo hopper was opened for unloading it was found that there was a hole in the front of the cargo compartment. The first survey made before the loading of the cargo did not reflect this hole. The manner in which the hole was made to the bulkhead has not been explained. Because of its location in the forward bulkhead, the hole could not have been the result of a casualty while in transit. The court must conclude that the hole was not discovered by the surveyor on the original survey. However, if it had not been for the tears or holes in the outerskin of the barge, water could not have collected in the wing tanks and bow rake so as to enter the cargo compartment and damage the urea. The court holds that the existence of the unexplained hole in the cargo compartment does not act to relieve the tug of liability.

■ 6. The court holds that the tug breached its duty to exercise such reasonable care and maritime skill as prudent navigators employ in the performance of similar duties and is liable in damages to the barge unless the claim therefore is barred by laches.

Defendant Fielder has reserved the right to be heard on the issue of damages and laches. The entry of final judgment will await a determination of those issues.

The court will release an amended findings of fact and conclusions of law as of this date.

## APPENDIX

### STIPULATION

It is stipulated by and between the Plaintiff and all of the Defendants herein that:

Greenville River Services, Inc. is a Mississippi corporation organized, chartered and existing under the laws of the State of Mississippi, having its principal place of business at Greenville, Mississippi, and which operates a fleeting service called the White River Fleet. The fleeting service is used in fleeting river barges.

Barge EBI–126 is a 195 by 35 by 12 foot steel hopper barge which was operated by First Mississippi Corporation in May and June, 1973. The M/V HARRIET ANN delivered Barge EBI–126 to the White River Fleet at approximately 6:00 P.M., June 5, 1973. The M/V BETTY LENSING, operated by Greenville River Services, Inc. was used to transfer Barge EBI–126 from the tow of the M/V HARRIET ANN to the Greenville River Services' White River Fleet.

The crew of the M/V BETTY LENSING inspected Barge EBI–126 prior to placing the barge in the White River Fleet, and Barge EBI–126 was delivered and accepted by Greenville River Services as a barge reasonably safe and in a seaworthy condition. Barge EBI–126 was within the custody and control of Greenville River Services, Inc. from approximately 6:00 P.M., June 5, 1973, until approximately 6:30 P.M., June 6, 1973. During said time, Greenville River Services, Inc.'s personnel made periodic inspections of the wing tanks and rake of Barge EBI–126 and the barge was found to be in a reasonably safe, watertight, and seaworthy condition at all times, and no evidence of leakage was found in the skin of the barge.

The crew of the M/V BETTY LENSING inspected Barge EBI–126 at approximately 6:30 P.M., prior to delivery of the barge to the M/V JENNIFER CUMMINS on June 6, 1973 and found no change in the barge as Barge EBI–126 was found to be in a safe, watertight and seaworthy condition. The Barge EBI–126 was in substantially the same condition as it was in when the barge was delivered to the White River Fleet.

Barge EBI–126 was delivered and accepted into the tow of the M/V JENNIFER CUMMINS in substantially the same condition it was in when the barge was accepted by Greenville River Services, Inc. at its White River Fleet.

FIRST MISSISSIPPI CORPORATION, By Its Attorney

(s) JAMES L. ROBERTSON
JAMES L. ROBERTSON

FIELDER TOWING CO. INC., and the M/V JENNIFER CUMMINS and HARTFORD INSURANCE GROUP, By Its Attorney

(s) WILLIAM G. BEANLAND
. WILLIAM G. BEANLAND

WARFIELD TOWING SERVICES, INC., By Its Attorney

(s) FRANK S. THACKSTON
FRANK S. THACKSTON

GREENVILLE RIVER SERVICES, INC., By Its Attorney

(s) ERNEST LANE, III
ERNEST LANE, III

ADDENDUM

The term seaworthiness as used in this stipulation does not refer to the watertight integrity of any bulkhead or floor of the cargo compartment. On EBI 126, however, Greenville River Services personnel found nothing to indicate any lack of watertight integrity of any bulkhead or floor of any compartment on EBI 126.

JLR          FST          WGB          EL

SUPPLEMENTAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

A.  *Findings of Fact.*

The court reopened this case for the reception of additional evidence on the question of liability. This evidence was received on December 4, 1978, and the matter is now ripe for decision.

After considering the additional evidence, the court amends the findings of fact and conclusions of law adopted February 23, 1978, published in 456 F.Supp. at pages 576, et seq., as follows:

The last sentence in finding of fact No. 40, *id.* 579, is deleted and in its stead there is inserted the sentence as follows:

This testimony has been considered but the court is not satisfied that the striking of some object, not necessarily a fixed object, would necessarily have awakened him.

Findings of fact Numbers 41 and 42 are deleted and new findings Numbers 41, 42 and 43 are inserted in their stead. They are as follows:

41. The nature and characteristics of the tears and holes in the bottom of the bow rake and wing tanks are such as would probably have occurred had the barge come into contact with some hard object or objects in the movement upriver.

42. The evidence before the court reflects that at the time of the movement of

the barge upriver the stage of the river was such that the tops of the stone dikes along the route of the tug and its tow during the voyage were submerged not less than seventeen (17) feet. The holes or tears which existed in the barge on its delivery at Friars Point were of the type that one would reasonably conclude they were caused by the barge moving over the dikes and scraping or coming into contact with them. The uncontradicted evidence shows that the dikes were so deeply submerged in the river as to render impossible such an occurrence.

43. The evidence does not affirmatively reflect any reason for the holing of the barge while in the tow of the tug.

### B. Conclusions of Law.

Conclusions of law Numbers 4, 5 and 6 are deleted and inserted in their stead are new findings 4, 5 and 6, as follows:

4. The parties did not introduce any evidence from which the court could make a finding as to the cause of the holes or tears in the barge. The parties stipulated that the barge, when received by the tug, was in the same condition as when accepted by Greenville River Services, Inc., at its White River Fleet, at which time the barge was inspected by the crew of the M/V BETTY LENSING (operated by Greenville River Services, Inc.) and accepted as a barge reasonably safe and in a seaworthy condition. This stipulation, however, did not refer to the integrity of the bulkhead or floor of the cargo compartment of the barge. The court concludes, based upon this stipulation, that the holes or tears which were found in the bottom of the rake bow and wing tanks of the barge were non-existent when the barge was placed in the tow of the tug. It necessarily follows that the holes or tears appearing in the barge upon delivery were sustained on the voyage while in the care of the tug.

■ The court recognizes and adopts the rule that the mere fact that a barge is in good order when received and in a damaged condition when delivered does not raise any presumption of fault. *Stevens v. The White City*, 285 U.S. 195, 202, 52 S.Ct. 347, 76 L.Ed. 699 (1932).

■ The court also recognizes the rule, approved by the Fifth Circuit in a number of cases, that while the burden is on the tow to show negligence on the part of the tug, special circumstances may create a strong presumption of negligence, in which event the burden is on the tug to rebut the prima facie case, or, at least to show a reasonable excuse for the accident other than its own negligence. *Bisso v. Waterways Transportation Company*, 235 F.2d 741, 744 (5th Cir. 1956). *Simkins v. R. L. Morrison & Sons, supra.*

■ Accepting as correct the finding that the holes or tears in the barge did not exist when the barge was taken into the tow of the tug, it is obvious that they could not have been inflicted on the barge absent negligence of the tug. It was the duty of the tug to come forward with some reasonable explanation as to the manner in which the holes or tears were sustained by the barge. This was not done by the tug. The only member of the crew who testified was the captain, and the tug's log was not produced. The court concludes that the tug failed in its duty to offer a reasonable explanation which would exonerate it from negligence.

■ 5. The water entered the wing tanks and bow rake during the movement upriver and was detected when unloading operations were commenced. When the cargo hopper was opened for unloading it was found that there was a hole in the front of the cargo compartment. The first survey made before the loading of the cargo did not reflect this hole. The manner in which the hole was made to the bulkhead has not been explained. Because of its location in the forward bulkhead, the hole could not have been the result of a casualty while in transit. The court must conclude that the hole was not discovered by the surveyor on the original survey. However, if it had not been for the tears or holes in the outerskin of the barge water could not have collected in the wing tanks and bow rake so as to enter the cargo compartment

**1088**

and damage the urea. The court holds that the existence of the unexplained hole in the cargo compartment does not act to relieve the tug of liability.

6. The court holds that the tug breached its duty to exercise such reasonable care and maritime skill as prudent navigators employ in the performance of similar duties and is liable in damages to the barge unless the claim therefor is barred by laches.

Defendant Fielder has reserved the right to be heard on the issue of damages and laches. The entry of final judgment will await a determination of those issues.

The court will release an amended findings of fact and conclusions of law as of this date.