AGRICO CHEMICAL COMPANY, Plaintiff,

v.

M/V BEN W. MARTIN (ex: M/V GREENVILLE), Et Al., Etc., Defendants-Third-Party Plaintiffs-Appellees,

v.

BRENT TOWING CO., INC., Third-Party Defendant-Appellant.

No. 80–3179.

United States Court of Appeals, Fifth Circuit.

Dec. 17, 1981.
Rehearing and Rehearing En Banc Denied Feb. 1, 1982.

Harold W. Duke, Joel J. Henderson, Greenville, Miss., for third party defendant-appellant.

E. Spivey Gault, W. Wayne Drinkwater, Jr., Greenville, Miss., for defendants-third-party plaintiffs-appellees.

Before GEE and RUBIN, Circuit Judges, and SPEARS *, District Judge.

ALVIN B. RUBIN, Circuit Judge:

A barge loaded with liquid nitrogen fertilizer capsized. The parties involved in supplying and moving the barge concede their liability to the owner of the cargo but each contends that the other was liable for the loss. Based on what we consider to be a misconstruction of the contractual relationship between the parties, the district court found only one party at fault. We find

* District Judge of the Western District of Texas, sitting by designation.

both negligent, apportion the liability equally between them, and remand for further proceedings.

Agrico Chemical Company manufactures and sells various chemical products, including 32% liquid nitrogen fertilizer (urea ammonium nitrate or UAN), which it manufactures at a plant near Tulsa, Oklahoma. Agrico contracted with Brent Towing Company to provide the marine services and equipment necessary to transport Agrico's products on a continuing basis. During October 1977, Agrico advised Brent that, pursuant to the contract, it had more than 5000 tons of UAN to be moved from its Oklahoma plant to Westwego, Louisiana. Brent assigned two of its barges to the task and engaged Logicon's tow boat, the M/V GREENVILLE, to tow the barges on a mills-per-ton-mile basis, the usual way in which it engaged a tow. Brent concedes that its contract with Agrico was not a charter but a contract of affreightment. Logicon provided the tug and crew, arranged and paid for insurance, paid the expenses of the trip and was compensated in the same manner in which a taxi would be paid.

Agrico then informed Brent that it wished to move an additional 3,000 tons of UAN. Brent had no other barge available, so Malcolm Gunter, Brent's traffic manager, communicated with Herman Pardue, Logicon's port captain, seeking sufficient space on a Logicon barge to move the additional cargo.

Pardue informed Gunter that the Logicon 2702, a 27,000 barrel, single-skinned barge, was available and could be added to the GREENVILLE's tow. This barge, however, had previously been loaded with diesel fuel, and was scheduled for another fuel charter in fifteen days. Therefore, Pardue requested that Brent clean the barge's tanks after it had been used to transport UAN, so that it would be fit again to haul diesel fuel. Payment was to be made on a mills-per-ton-mile basis without regard to the number of days the trip took. Logicon was to provide insurance on the barge. No on-charter survey of the Logicon barge was intended, and none was made.

Brent's tankermen were to load the two Brent barges. There is conflict in the testimony concerning whose tankermen were to load the Logicon barge; the district court found, however, that this was to be Brent's responsibility. Brent was to receive daily position reports on the barge but furnished no crew and did not direct its movement.

The interior of the Logicon barge consisted of ten cargo tanks, five on each side of a centerline bulkhead. The centerline bulkhead was liquid-tight only at the number one (forward-most) port and starboard tanks; that part of the bulkhead separating cargo compartments two through five contained "baffles" or openings that permitted liquid to flow between the port and starboard tanks. Diesel fuel is lighter than water, and the barge can be loaded almost to its top with diesel fuel without causing the barge to be overloaded. UAN, however, is so much heavier than water that the vessel is down to its draft line when loaded with a much smaller volume of UAN than of diesel fuel. Thus, there is more empty space in the cargo tanks, leaving more room for the liquid to shift when the barge is loaded with UAN rather than with diesel fuel. When the heavier fluid, UAN, shifts from one side of the barge to another, the stability of the barge is threatened.

Most barges used to transport liquids have a liquid-tight centerline bulkhead. Barge 2702 was, therefore, unusual, although the conventional exterior of the barge gave no visible suggestion of its internal structure. Gunter testified that he told Pardue that the cargo to be transported was UAN and that Pardue said nothing about the construction of the barge. This testimony was not contradicted, and the district court made no finding of fact with regard to these matters.

One of Logicon's employees, a tankerman named Homer Bland, testified that, while the barge was en route to Oklahoma, he overheard a radio conversation between Pardue and the GREENVILLE's master, Captain Cecil Jacobs, in which the intended cargo of UAN was mentioned. Thereupon,

Bland, who had thought the intended cargo was oil, said to Captain Jacobs, "I wouldn't think it was a good barge to load with fertilizer. The way it is made, it is made odd, and it just takes a pretty good tankerman to understand it before you would undertake a job like that." Bland testified that the barge "will roll on you" because "the compartments are together as one complete compartment, instead of having port and starboard compartments." Thus, when the cargo shifts, as he later testified, all of it "goes to one side and causes it to roll."

Bland testified that he was directed to explain the barge's construction and the proper loading procedure to Brent's employees. When the barge arrived at Agrico's plant, two Brent tankermen, experienced in handling UAN, began loading. Bland testified that he suggested to the tankermen the order the tanks should be filled. After four hours of loading, the 2702 began to list. One of Brent's tankermen then sought out Bland, who informed the Brent tankerman of the nature of the bulkheads, which permitted the cargo to shift from one side to the other. The district judge found that "[w]ith this knowledge [Brent's employees] continued with the loading, and with the advice and counsel, and at times the assistance, of Mr. Bland the matter was completed."

Loading the barge required twelve hours to complete. The Brent tankermen then left. The barge was afloat and appeared to be stable and level. "[A] little after" the Brent tankermen left, and before the tow commenced, however, the barge began to roll. Captain Jacobs telephoned Pardue for instructions, then directed Bland to get the barge leveled off so the tow could begin. Bland put pumps on the barge and transferred some of the cargo from the first compartment to the other compartments, thus, of course, altering the distribution of the cargo. The barge was left tied up overnight, and the tow commenced the next morning.

The GREENVILLE towed the three barges, including the two Brent barges and the Logicon barge, to Greenville, Mississippi. There the barges were tied up, and the GREENVILLE went into dry dock for a wheel change. Coast Guard Chief Warrant Officer Frank Self testified that, while the barge was in Greenville, he had a conversation with Pardue, Logicon's port captain, and commented that the Logicon barge was listing to port. Pardue stated that he does not recall the subject matter of his conversation with the Coast Guard warrant officer. Self testified that Pardue mentioned that the barge had a cargo of liquid nitrogen fertilizer. Self also testified that he said to Pardue that he did not "really understand how you made it this far, because I am very familiar with that barge, and only the number one cargo tank has a solid centerline bulkhead in it, and with the free flow of fertilizer, it just will not stay upright, it is going to flow to one side or the other." To this, he said Pardue responded, "Well, I am going to Baton Rouge.... I am going down there and ... I will tie it off. I will pump the cargo out and I will return it back and make all those compartments watertight, the centerline bulkheads watertight." Self said that Captain Jacobs had informed him that, during the downriver trip, "when he was making turns in the river that the barge [Logicon 2702] would lean quite extensively, to port or starboard, which ever way he was turning."

On the morning of November 12, the crew of the M/V GREENVILLE was attempting to make up the tow so that it could continue the downriver voyage. The GREENVILLE was brought outside Logicon 2702 and was being used to slide the barge forward when the barge began to roll and then suddenly capsized.

Agrico sued only Logicon and its vessels. Logicon filed a third-party complaint against Brent seeking indemnity or contribution, and also seeking the damages suffered by its barge. After an evidentiary hearing on liability issues only, the district judge held that the arrangement between Brent and Logicon constituted a charter, and that Brent was functioning as a stevedore in loading the 2702. The court noted

that as a stevedore Brent owed a duty of workmanlike performance to Logicon and that Brent's tankerman had committed a breach of this duty in continuing to load the barge after they knew of the openings in the centerline bulkhead. "[I]t was Brent's duty at that time . . . to discontinue the loading of the barge and thereby avoid an unseaworthy condition in connection therewith."

The judge also found that Logicon was not skilled or knowledgeable in connection with the movement of this kind of product and made no representation that the barge would be seaworthy for its movement. He added, however, that the

> master of the tug and its tankerman [presumably Bland] were familiar with this situation, that this was an unseaworthy vessel at the time they took it in tow. The fact that it might have been level and was not listing . . . would not in my opinion relieve them of the duty and responsibility of knowing that, in the voyage the tug would undertake the product would move from place to place and render the barge unseaworthy during its passage.

The judge concluded, nonetheless, that Logicon's acts did not cause the loss, for the cargo was not lost "in the movement between the place where the movement started and Greenville." The "sole and only reason the cargo was lost was the shifting of the cargo within the barge so as to make it capsize. The towage of the vessel did not have any causal connection with the capsizing of the barge."

Holding that sole liability rested on Brent, the district judge entered judgment for Agrico against Logicon for the full amount of its damages, to be determined later, and awarded Logicon indemnity from its damages against Brent.[1] The key issue, about which the other determinations revolve, is the nature of the contract between Brent and Logicon, for that determines the rights and duties of each. Accordingly, we first examine that question.

1. The district judge also found that Brent was entitled to an interlocutory appeal on the issue of liability. 28 U.S.C. § 1292(a)(3). Section 1292(a)(3) has been narrowly construed and

I.

Barges are vessels, but of a peculiar kind. A. Parks, Law of Tug, Tow and Pilotage 4 (1971). Lacking power and usually crew, barges depend upon another vessel, a tug, for movement. A contract for a tug to move a barge is one of towage. The tug is neither a bailee nor an insurer of the tow. *See Southwestern Sugar and Molasses Co. v. River Terminals Corp.*, 360 U.S. 411, 418 n.6, 79 S.Ct. 1210, 1215 n.6, 3 L.Ed.2d 1334, 1341 n.6 (1959); *Nat G. Harrison Overseas Corp. v. American Tug Titan*, 516 F.2d 89, 94 (5th Cir. 1974), *as modified*, 520 F.2d 1104 (5th Cir. 1975); *Humble Oil & Refining Co. v. Tug Crochet*, 422 F.2d 602, 606 (5th Cir. 1970); *First Mississippi Corp. v. Fielder Towing Co.*, 469 F.Supp. 1080, 1084 (N.D.Miss.1979). The tug is, however, obliged to use " 'such reasonable care and maritime skill as prudent navigators employ for the performance of similar service.' " *First Mississippi Corp.*, 469 F.Supp. at 1084, *quoting from, Stevens v. The White City*, 285 U.S. 195, 202, 52 S.Ct. 347, 350, 76 L.Ed. 699, 703 (1932).

A towage contract, imposing the duties we have described, arises when one vessel is employed to expedite the movement of another. A. Parks, *supra*, at 22. If, however, the tug is engaged to do more than merely tow another's vessel, the contract is considered one for the movement of the tow and its contents, a contract of affreightment, subject to the more exacting duties applicable to those who undertake as carriers to transport cargo. *See Southwestern Sugar and Molasses Co. v. River Terminals Corp.*, 360 U.S. 411, 417 n.6, 79 S.Ct. 1210, 1215 n.6, 3 L.Ed.2d 1334, 1341 n.6 (1959) (a common carrier is liable "without proof of negligence, for all damage to the goods transported by it," but liability in the normal tug-tow relationship has not been held to extend this far). Thus, "when a tug

"basically limited to cases where there has been a determination of liability but not yet a computation of damages." *Tradax Ltd. v. Holendrecht*, 550 F.2d 1337, 1341 (2d Cir. 1977).

and barge are owned by the same person (or when either the tug or barge is bareboat-chartered to the same person) and are utilized, by contract, to tow cargo from one point to another, the contract is one of affreightment and not towage." A. Parks, *supra* at 22. *Sacramento Navigation Co. v. Salz*, 273 U.S. 326, 328, 47 S.Ct. 368, 369, 71 L.Ed. 663, 664 (1927); *Continental Grain Co. v. American Commercial Barge Line Co.*, 332 F.2d 26, 27 (7th Cir. 1964).

 The owner of a barge may, like the owners of other vessels, agree by contract to allow another to use it. This contract, usually called a charter party or charter, may assume a variety of forms. If full possession and control of the vessel is turned over to the charterer, the contract is a demise or bareboat charter. The primary obligation of the owner under such a charter is to furnish a vessel in seaworthy state when it is delivered to the charterer. G. Gilmore & C. Black, The Law of Admiralty 241 (2d ed. 1975). The charterer is regarded as the owner of the vessel for the period of the charter and is responsible for the vessel's operation. *Id.* at 242.

 A "bareboat" or demise charter requires "complete transfer of possession, command, and navigation of the vessel from the owner to the charterer." *Gaspard v. Diamond M. Drilling Co.*, 593 F.2d 605, 606 (5th Cir. 1979). A demise is "tantamount to, though just short of, an outright transfer of ownership." *Guzman v. Pichirilo*, 369 U.S. 698, 700, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205, 208 (1962). It need not, however, be in writing.

 A vessel may, of course, be chartered in some other fashion, for example for a single voyage ("voyage charter"), or for a fixed period of time ("time charter"). Typically in the case of conventional vessels, the owner remains in control during such charters, and provides the master and crew. Because barges lack power and usually have no crew, contracts for the mere use of a barge are usually bareboat, A. Parks, *supra*, at 394, although this is not inevitable. The owner may not only char-

ter the barge but may also provide a tow and remain in control of the barge.

 Whatever the nature of the vessel, the rules concerning responsibility for its operation are the same. If the owner retains control, he remains liable for all damages arising out of its operation whether the charter be only for a single voyage ("voyage charter") or for a fixed time ("time charter"). If the charter is a demise, the charterer is responsible. The charter may describe the duties of the parties and provide for the shifting of risks between them, but, in general, control entails responsibility for fault.

Thus, if the Logicon-Brent agreement for use of the Logicon barge was a bareboat charter and the agreement to tow that barge was a contract of towage, Logicon would be liable only if it were negligent in towage or if it failed to provide a seaworthy vessel. If, however, their arrangement was a contract of affreightment for the benefit of Agrico, primary liability to Agrico for damage to its cargo rests on Logicon. A. Parks, *supra*, at 24.

The agreement between Agrico and Brent was certainly a contract of affreightment, as it was declared to be by the district court. The contract between Brent and Logicon to tow Brent's two barges from Oklahoma to Louisiana was equally clearly a towage contract. As to Agrico, the cargo owner, Brent was responsible for the delivery of the cargo. Brent in turn could look to Logicon only for reasonable diligence in towage. The agreement by Logicon to supply and to tow the third barge is more difficult to characterize. We look to its terms to determine whether the arrangement should be considered two separate contracts, one a barge charter, the other a towage contract, or whether the terms for the use of the barge made that agreement an affreightment contract.

The district court found that

the nature of the contract was one of charter rather than a contract of affreightment. That is, for the period of time necessarily involved in the shipment, that the barge was made available to

Brent for that purpose.... [T]he barge was then placed in the tow of the vessel which was to transport the other two barges to the plaintiff's plant in Oklahoma in order to receive the cargo that was to be transported by Brent under its contract of affreightment with [Agrico].

The district court made only one other factual finding of any possible relevance to the issue: that Brent's tankermen were in control of the loading process and that Brent was, therefore, a stevedore.

■■■■ The terms of the oral agreement between Gunter, representing Brent, and Pardue, representing Logicon, all point away from bareboat charter. The bareboat charter is not a device for the conduct of the business of shipping but is instead an instrument designed to vest in one person most of the incidents of ownership in a capital asset of that business, a vessel, while another retains its general ownership and the right of reversion. G. Gilmore & C. Black, *supra* at 239. The bareboat charterer typically is required to carry insurance on the vessel as well as protection and indemnity insurance and crew insurance. *See* A. Parks, *supra*, at 406 (The Standard Form of Bareboat Charter, ¶ 4). Though not essential, a survey of the vessel on delivery and redelivery is customary to determine the condition of the vessel at the beginning of the charter and its condition at the end, so as to fix responsibility for and limit disputes about damage during the charter. Because the charter is for the use of the boat bare, the compensation is for the furnishing only of that asset. The term for a bareboat charter would not be for a single, short voyage. Indeed, the usual single voyage charter or charter for a limited period of time provides for control by the owner. A. Parks, *supra* at 394.

Payment for the Logicon was to be made on the basis of mills-per-ton-mile, a measure that included compensation both for furnishing towing and for use of the barge. Such a measure is inherently inconsistent

with the concept of the charter bare of a dumb barge. There was testimony that such payment is typical of affreightment contracts. Both the master who had control of the barge and the crew were Logicon's employees. Logicon was responsible for insurance. No survey was made or contemplated either on delivery or redelivery.

■■■■ Thus Logicon had "possession, command and navigation" of the barge under an agreement to transport it from one port to another. *See Guzman v. Pichirilo*, 369 U.S. 698, 699, 82 S.Ct. 1095, 1096, 8 L.Ed.2d 205, 208 (1963); *Reed v. United States*, 78 U.S. (11 Wall) 591, 600–01, 20 L.Ed. 220, 222–23 (1871); *Anderson v. United States*, 450 F.2d 567, 572 & n.15 (5th Cir. 1971), *cert. denied*, 406 U.S. 906, 92 S.Ct. 1608, 31 L.Ed.2d 816 (1972); *Stockton Sand & Crushed Rock Co. v. Bundensen*, 148 F.2d 159 (9th Cir. 1945). *But see The Independent*, 122 F.2d 141 (5th Cir. 1941) (holding no contract of affreightment when a barge was chartered for $500 a month and the charterer then contracted with the owner to tow the barge on a short trip for $50). We conclude that the contract between Brent and Logicon was a contract of affreightment whereby Brent subcontracted with Logicon to perform part of its duties under its own affreightment contract with Agrico.[2]

## II.

■■■■ The district court also concluded that Brent was the stevedore for loading the Logicon 2702 and, as such, owed a duty of workmanlike performance to the vessel's owner, as recognized in *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124, 133–34, 76 S.Ct. 232, 237, 100 L.Ed. 133, 141 (1956). The duty of workmanlike performance arises out of the stevedoring contract, but it does not automatically imply that the stevedore owes the owner indemnity against all liability under all circumstances. *Ryan* arose out of a suit by a longshoreman, injured by cargo improperly stowed by the

---

2. In view of this conclusion, we need not consider whether the Logicon 2702 was unseaworthy, or what Logicon's duty would have been

as tower of a barge bareboat chartered to another.

stevedore, against the vessel owner for liability based on unseaworthiness of the vessel, a liability without fault, *Seas Shipping Co. v. Sieracki*, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946). The shipowner was allowed indemnity because the stevedore had impliedly warranted performance of its contract to load the vessel in a workmanlike manner. In this situation, the shipowner's failure to discover and correct the stevedore's breach did not reduce or diminish the indemnity.

The *Ryan* doctrine thus includes two facets: an implied undertaking by a stevedore to render workmanlike performance and the stevedore's duty to indemnify the owner for liability arising out of its breach of the duty. The doctrine was developed in response to the *Sieracki* rule imposing on the shipowner a nondelegable duty, regardless of fault, to provide a seaworthy vessel to seamen and those who do seamen's work. We have recognized "that the *Ryan* doctrine is designed to serve special problems in maritime law arising from the absolute and nondelegable duty of seaworthiness which general maritime law imposes upon all vessel owners." *Hobart v. Sohio Petroleum Co.*, 445 F.2d 435, 438 (5th Cir.), *cert. denied*, 404 U.S. 942, 92 S.Ct. 288, 30 L.Ed.2d 256 (1971). "[T]he predicate of the doctrine is the shipowner's absolute nondelegable liability under the seaworthiness guaranty." *Id.* at 439. Therefore, in *Hobart*, we refused to extend *Ryan*'s indemnity to protect a party who "owes no more than an ordinary duty to act as would a reasonably prudent person." 445 F.2d at 440 (in that case, the shipper, rather than the shipowner).[3] "[P]roof of a breach of

the warranty of workmanlike performance does not ipso facto establish a right to indemnity by the vessel." *F. J. Walker Ltd. v. Motor Vessel "LEMONCORE"*, 561 F.2d 1138, 1148 (5th Cir. 1977). "Obviously, if such breach is not an operative factor in the damages that occur, or if conduct on the part of the shipowner causes the injury ... indemnity should be denied." *Id.* Therefore, in *Gator Marine Service Towing, Inc. v. J. Ray McDermott & Co.*, 651 F.2d 1096 (5th Cir. 1981), we refused to extend *Ryan*, pointing out that, "[t]here is little logical appeal in this proposed extension of a doctrine so withered. Disputes between vessels and stevedores over damaged cargo are best accommodated by a straightforward application of the usual maritime comparative fault system." *Id.* at 1100. "Proportional damages based on degrees of fault is now the general rule for damages in maritime property damage cases." Gorman, *supra* note 3, at 55.

We have recently applied these rules to apportion fault, rather than impose full indemnity, as between the parties whose fault occasioned a cargo loss. In *Gator Marine Service Towing, Inc. v. J. Ray McDermott & Co.*, 651 F.2d 1096 (5th Cir. 1981), we found the cargo-loader (which happened to be the owner of the cargo) and the transporting vessel concurrently negligent in causing a vessel to capsize. The loader was negligent in loading a fifteen-ton spool of wire on the deck without securing it against sideward movement. The vessel crew was concurrently negligent in failing to conduct periodic inspections of the cargo during the voyage. The intervening vessel negligence was "precisely the sort of conduct the Supreme Court anticipated in leaving open the

---

**3.** "The Fifth Circuit has resisted the expansion of *Ryan* indemnity beyond the facts of *Ryan*." Gorman, *Ryan* Indemnity in Maritime Property Damage Cases: What of Proportionate Fault? 8 Balt.L.Rev. 42, 48 & n. 39 (1978). Even if the undiluted *Ryan* doctrine applies, indemnity is due only "absent conduct on [the owner's] part sufficient to preclude recovery." *Weyerhaeuser S.S. Co. v. Nacirema Operating Co.*, 355 U.S. 563, 567, 78 S.Ct. 438, 441, 2 L.Ed.2d 491, 494 (1958). In the classical *Ryan* situation this means only conduct on the part of the shipowner which prevents the stevedore's work-

manlike performance, *Waterman S.S. Corp. v. David*, 353 F.2d 660, 665 (5th Cir. 1965), *cert. denied*, 384 U.S. 972, 86 S.Ct. 1863, 16 L.Ed.2d 683 (1966); *Brock v. Coral Drilling, Inc.*, 477 F.2d 211, 217 (5th Cir. 1973).

In 1972, amendments to the Longshoremen's and Harbor Workers' Compensation Act abrogated the *Ryan* doctrine as it applies to personal injury and death actions by employees. 33 U.S.C. § 905(b) (a stevedore will not be allowed to bring an action against the vessel if the injury was caused by the negligence of the stevedore).

possibility that an indemnity claim under the *Ryan* doctrine might be defeated or reduced." *Id.* at 1100. Damages were divided in proportion to fault, in reliance on *United States v. Reliable Transfer Co.*, 421 U.S. 397, 407, 95 S.Ct. 1708, 1713–1714, 44 L.Ed.2d 251, 259–60 (1975).

█ Application of these principles to the present case leads to a readily predictable result. Brent was negligent in loading the cargo. As a stevedore, Brent violated its duty of workmanlike performance. Logicon, however, was negligent in considering that mere redistribution of the UAN would correct the barge's condition, in taking the barge in tow while it was unstable, in unhitching it at Greenville, and, perhaps, in even supplying the barge without warning of its hidden quality that made it unsuitable for this cargo.[4]

We deem it unnecessary to remand for fault-apportionment.[5] The fault appears to have been equal and damages to the cargo and the barge should be divided between Logicon and Brent.

The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.

---

4. That the sinking occurred when the vessel was not actually engaged in movement is purely circumstantial. The barge was under Logicon's control and was in the course of the downstream tow. *Stevens v. East-West Towing Co.*, 649 F.2d 1104, 1109 (5th Cir. 1981) (The "warranty of workmanlike performance extend[s] to all towing operations including preparations necessary and incident to the actual towing of the barge.").

5. *See Levin v. Mississippi River Fuel Corp.*, 386 U.S. 162, 169–70, 87 S.Ct. 927, 932, 17 L.Ed.2d 834 (1967).