## MINERAIS U.S. INC., EXALMET DIVISION

### v.

### M/V MOSLAVINA, et al.

Civ. A. No. 91–1988.

United States District Court,
E.D. Louisiana.

March 23, 1994.

Memorandum Amending Judgment,
April 18, 1994.

John Christopher Person, Montgomery, Barnett, et al, New Orleans, LA, for Minerais U.S. Inc., Exalmet Division.

John Harold Clegg, Chaffe, McCall, et al, New Orleans, LA, for Boka Ocean Shipping.

John Harold Clegg, Daphne P. McNutt, Chaffe, McCall, et al, New Orleans, LA, for Jugoslavenska Oceanska Plovidba.

Richard B. Foster, Lemle & Kelleher, New Orleans, LA, for Turner Marine Bulk Inc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SEAR, Chief Judge.

Plaintiff Minerais U.S. Inc. ("Minerais") brought this action under the court's admiralty and maritime jurisdiction, 28 U.S.C. § 1333, against the M/V MOSLAVINA, Jugoslavenska Oceanska Plovidba, Boka Shipping Company and Turner Marine Bulk, Inc. ("Turner") for damage to a cargo of ferrochrome that was being carried from Antalya, Turkey to New Orleans, Louisiana and then to East Liverpool, Ohio. On April 10, 1992 plaintiff voluntarily dismissed its claims against all defendants except Turner, the company that provided stevedoring services in New Orleans. Plaintiff alleges that due to Turner's improper handling and stowage of the cargo, two different grades of ferrochrome were commingled and the higher grade of material had to be downgraded for purposes of resale. Defendant contends that it is not liable and that plaintiff and/or S.H. Bell, the company that unloaded and stored the cargo in Ohio, should be held responsible for the commingling of the two grades of ferrochrome.

The issue of whether Turner is liable for the damages was tried to the Court without a jury. After considering the evidence introduced by the parties, the testimony of the witnesses, and the applicable law, I now make the following findings of fact and conclusions of law.

### I. Findings of Fact

In the spring of 1990 Minerais purchased 700 metric tons of high grade, low carbon ferrochrome and 1,000 metric tons of low grade, low carbon ferrochrome from Ronly Ltd., a British company.[1] The maximum carbon content for high grade ferrochrome is .06 percent and the maximum carbon content for low grade ferrochrome is .10 percent. However, the two grades are identical in their physical appearance and cannot be distinguished by the naked eye.

On April 28, 1990, Minerais shipped the cargo from Antalya, Turkey to New Orleans, Louisiana aboard the M/V MOSLAVINA.[2] On or about May 16, 1990, before the cargo arrived in New Orleans, Minerais entered into a contract for stevedoring services with Turner whereby Turner agreed to discharge the cargo from the M/V MOSLAVINA at Turner's bulk terminal in New Orleans. Minerais instructed Turner that there were two grades of ferrochrome, and that Turner was to place a portion of the high grade ferrochrome on the pad for forwarding to a New Orleans purchaser and was to load the remainder of the ferrochrome into the Barge ING–4588.[3] Minerais further instructed Turner that the two grades of ferrochrome were to be kept separate on the barge and not commingled.[4] Minerais did not specifically instruct Turner how to separate the two lots on the barge or how to prevent commingling.[5]

The M/V MOSLAVINA arrived at Turner's terminal in New Orleans on May 30, 1990. According to the vessel's cargo stowage plan, the 700 metric ton lot of high grade cargo was stowed in the center port side of hold # 4, and the 1,000 metric ton lot of low grade cargo was stowed in the aft starboard side of hold # 4.[6] The two lots were separated in the vessel by wooden planks.[7]

At 9:30 A.M. on May 30, 1990, Turner's day crew opened the Barge ING–4588 and transferred a portion of the high grade material from the vessel into the barge.[8] Between 2:00 P.M. and 4:00 P.M. that same day, the day crew began transferring another portion of the high grade material from the

---

1. Joint Exhibits 2, 3; Deposition of Thomas Mayrides, at 4–5.

2. Joint Exhibit 1.

3. Joint Exhibit 5, 6.

4. By telcfax, Minerais instructed "KEEP TWO GRADES SEPARATE—DO NOT CO–MINGLE." Joint Exhibit 7.

5. Joint Exhibit 7; Deposition of Patricia Blevins, at 7–9.

6. Joint Exhibit 11.

7. Joint Exhibit 14.

8. Joint Exhibit 14.

vessel to a flat deck barge, the M–832, for transfer to Turner's pier so that approximately 250 metric tons of the high grade material could be weighed and kept ashore for delivery to one of Minerais' New Orleans customers.[9] At 6:00 P.M. on May 30, 1990, Turner's night shift took over the transloading operations from the day crew. The night crew finished transferring the high grade material from the vessel to the Barge M–832 for the New Orleans customer.[10] Then the night crew transloaded all of the low grade material from the vessel onto the Barge ING–4588.[11]

Henry Walker, Turner's Dock Superintendent, testified concerning stowage of the cargo aboard the Barge ING–4588. According to Walker, the Turner employees knew to keep the two grades of ferrochrome separate based on the vessel discharge plan prepared by Larry Arnold, Turner's traffic coordinator.[12] Larry Arnold testified that he prepared the vessel discharge plan to instruct the Turner employees how and where to discharge the cargo from the M/V MOSLAVINA.[13] I find that it was clear to the Turner employees that the two lots of ferrochrome were to be stowed separately on the barge and not commingled.

Henry Walker testified that Turner stowed the lot of high grade material at one end of the Barge ING–4588 in two piles, and stowed the lot of low grade material at the other end of the barge in three piles. According to Walker, the two sets of piles were separated by a space of approximately twenty (20) feet. Walker testified that he did not recall at which end of the barge—bow or stern—the respective piles were located, nor did he ever record that information anywhere. Turner did not place physical barriers between the two lots, nor did Turner mark the two sets of piles in any way.

Walker's testimony concerning Turner's stowage of the cargo is corroborated by a diagram he drew in the dock superintendent's log book during loading operations on May 31, 1990.[14] The diagram shows three piles of cargo at one end of the barge and two piles at the other end of the barge, separated by some unidentified distance. There is nothing showing which lot was in the bow and which lot was in the stern of the barge. Instead, in the diagram Walker identifies the two lots by where they were located on the M/V MOSLAVINA: under the three-pile lot is written "stbd aft" and the under two-pile lot is written "c/port." It is not clear from the drawing that these are references to where the cargo was stowed on the vessel as opposed to the barge.

Both parties rely on the June 1, 1990 sampling report prepared by DeVan Inspection Company, Inc. to identify where the two lots were stowed on the Barge ING–4588.[15] Sometime between May 30, 1990 and June 1, 1990, DeVan took samples of the cargo aboard the Barge ING–4588 and sent the samples to Andrew S. McCreath & Son in Pennsylvania for laboratory analysis.[16] According to the report, the 700 metric ton lot of high grade ferrochrome was loaded to the stern of the Barge ING–4588 and the 1000 metric ton lot of low grade ferrochrome was loaded to the bow of the barge.[17] Larry Deas, the manager of DeVan's New Orleans office, testified that he prepared the sampling report but admitted that he did not participate in the actual sampling. Instead, the information contained in the report was communicated to him by the three DeVan employees who performed the actual sampling. Accordingly, I find the document not

9. Joint Exhibits 8, 9 and 14; Deposition of Patricia Blevins, at 9, 17.

10. Joint Exhibit 14.

11. Joint Exhibit 14.

12. Joint Exhibit 13.

13. Larry Arnold testified that Minerais is referred to as "Silicon Valley" on the vessel discharge plan.

14. Joint Exhibit 22.

15. Plaintiff's Proposed Findings of Fact and Conclusions of Law, ¶ 38, 39; Defendant's Reply to Plaintiff's Proposed Findings of Fact and Conclusions of Law, ¶ 38, 39.

16. Joint Exhibit 17.

17. Joint Exhibit 17.

reliable based on Deas' lack of personal knowledge and, although both parties rely on it to establish the actual bow/stern locations of the cargo, I do not consider it highly probative of that fact.

Sometime on June 1, 1990, Turner's day crew used a payloader to transfer a portion of the high grade material from the flat deck barge back onto the Barge ING–4588.[18] Henry Walker testified that when a portion of cargo is loaded onto a flat deck barge to be measured and stored for a customer, after the proper quantity is obtained the crew places any leftover material back on the barge. As a general practice, the payloader places the cargo into the hopper, which in turn loads the cargo against the wall of the barge as opposed to mixing it in with the previously-stowed material. This causes the barge to list. Walker admitted that he was not present during the June 1, 1990 payloading operations.

Walker testified that when he reported to work on the evening of June 2, 1990, the Barge ING–4588 was listing. To eliminate the list, Walker and the night crew trimmed the barge.[19] According to Walker, when he entered the barge that evening, the configuration of the two lots of material was still as he had drawn it on May 31, 1990—there were two piles at one end of the barge separated by approximately twenty feet from three piles at the other end of the barge. Walker testified that because it was clear from the vessel discharge plan that the cargo that had come back onto the barge was part of the two-pile lot, the crew trimmed only the two-pile lot; no cargo was moved from the two-pile lot to the three-pile lot or vice versa.[20]

Turner's records indicate that the hatches were closed on June 2, 1990 and that no other operations were performed on the Barge ING–4588 following the June 2, 1990 trimming.

The 250 metric tons of high grade material discharged in New Orleans was sold as high grade material and no complaint was ever lodged by the New Orleans customer.

The Barge ING–4588 arrived at S.H. Bell Company's facility in East Liverpool, Ohio on June 29, 1990. Bell contracted with Minerais to unload the cargo from the Barge ING–4588 and store it pending sales by Minerais. Minerais instructed Bell that the barge would contain two different grades of low carbon ferrochrome—approximately 496 metric tons of high grade material and approximately 1102 metric tons of low grade material—and that these grades were to be kept separate. Minerais' original inbound barge notice to Bell provided no information as to how the cargo was stowed aboard the barge.[21]

Barge discharge operations commenced on June 29, 1990.[22] Paul Vincent, Bell's plant manager, testified that he was present when the barge arrived. He testified that on entering the barge he observed one pile at one end of the barge separated by twelve to fifteen feet from about four piles of identical cargo at the other end of the barge, and that it appeared that the cargo had been trimmed. The parties have also introduced a drawing Vincent made almost two weeks after discharge operations ended. The drawing depicts what appears to be three or four piles of cargo in the stern of the barge separated, by twelve to fifteen feet, from a single pile of cargo in the bow of the barge.[23] Considering the lapse of time between Vincent's personal observation of the cargo and his preparation of the drawing, I give relatively little weight to this drawing.

18. Joint Exhibit 16.

19. Joint Exhibit 22.

20. Joint Exhibits 16, 22.

21. Joint Exhibit 23. The "inbound barge notice" contains several notations in the "Notes" section, including the instruction: "different grades—same size—keep separate." Pat Blevins, the individual at Minerais who prepared the inbound barge notice, testified that she wrote this instruction and that it appeared in the notice that was telefaxed to Bell on May 30, 1990. Deposition of Patricia Blevins, at 30–32. The remaining notations were made by Mark Pease subsequent to the arrival of the Barge ING–4588 at the Bell facility. Deposition of Mark Pease, at 8–10.

22. Joint Exhibit 29.

23. Joint Exhibit 26.

Vincent testified that because he was unsure of the exact stowage of the cargo, he sought clarification from Mark Pease, Bell's office manager, regarding the precise locations and identity of the cargo, and how the cargo was to be removed.[24] According to Vincent, he would not have touched or proceeded to unload the cargo until after he received word from Pease as to how to unload the barge.[25] He admitted that according to Bell's records the barge was "worked" in some manner for approximately one hour on June 29, 1990.[26] He could not recall precisely what "work" was performed during that hour, but he testified that it could have been nothing more than opening the hatches and/or waiting for stowage information.

Mark Pease testified that after Vincent contacted him on June 29, 1990, Pease phoned John Barniac, the President of Minerais' Pittsburgh division, for stowage information.[27] Barniac, in turn, contacted Harold Smith, Turner's traffic manager, to obtain any stowage information Turner had in its possession.[28] The testimony concerning the conversations between Pease, Barniac, and Smith is highly unreliable. John Barniac testified that he had no independent recollection of his conversation with Harold Smith.[29] Harold Smith recalled having a conversation with Barniac, but testified that the only information he provided Barniac came solely from Turner's superintendent's log book. As previously discussed, the only information the log book contained regarding stowage of the Barge ING–4588 was Walker's drawing. The drawing depicted three piles of material at one end of the barge and two piles of material at the other end, with the notation "stbd aft" under the three-pile lot and the notation "c/port" under the two-pile lot to indicate from where on the M/V MOSLAVINA the cargo was unloaded.[30] I find that this is the only information Smith *could* have provided Barniac because it was the only information Turner had in its possession.

Mark Pease testified that when Barniac called him back with barge stowage information, he recorded the information in the "Notes" section of Minerais' inbound barge notice.[31] Pease testified that the only notations he recalled making on the barge notice at that time were the notations "forward bow" and "aft stern rear" to identify the respective locations of the high grade and low grade material.[32] He did not recall precisely when he wrote the words "two piles" and "three piles" in the "Notes" section of the inbound barge notice.[33] I consider the notations made by Mark Pease probative only of what Bell *believed* to be the locations of the cargo aboard the Barge ING–4588: that the high grade material was in the front/bow of the barge, separated by some amount of space from the low grade material in the back/stern of the barge.

In attempting to discern the stowage aboard the barge, the evidence suggests that Minerais looked to Turner alone for stowage information, and did not contact McCreath and/or DeVan for any stowage information they might have gathered in connection with the New Orleans sampling and analysis.

24. Deposition of Paul Vincent, at 6–7.

25. Deposition of Paul Vincent, at 6–7, 26.

26. Deposition of Paul Vincent, at 24–25.

27. Deposition of Mark Pease, at 31.

28. Testimony of Harold Smith.

29. Deposition of John Barniac, at 3, 5. Plaintiff sought to admit as evidence of the content of the conversation a "file note" purportedly prepared by John Barniac on July 24, 1990. This document is inadmissible hearsay under Federal Rule of Evidence 801(c). I reject plaintiff's argument that it falls within Rule 803(5)'s exception for recorded recollections. It was prepared nearly three weeks after the conversation took place, and Barniac testified that he was unable to recall having written the note or why he wrote it. Deposition of John Barniac, at 5, 10. The circumstances surrounding the confection of the note simply do not bring it within the hearsay exception. Moreover, the information contained in the document does little to clarify the facts of this case.

30. *See* discussion *supra* at 5.

31. Joint Exhibit 23; Deposition of Mark Pease, at 30.

32. Deposition of Mark Pease, at 30–31.

33. Deposition of Mark Pease, at 16.

Based on the information in the inbound barge notice, which included the information provided by Mark Pease, Vincent testified that he felt confident in unloading the barge. Accordingly, Bell unloaded a small pile in the bow separately from the remainder of the material.[34] Discharge operations were completed on July 2, 1990.[35] The small pile was placed into Bin # 64, then processed and placed into Bin # 50 on Bell's premises; the remainder was placed in Bin # 75.[36]

Following placement of the cargo in separate bins, Bell weighed the two lots and sent the weights to Minerais.[37] A small discrepancy in the expected weights prompted Minerais to contact Bell about a possible commingling problem.[38] At Minerais' instruction, samples of the material in the two separate bins were taken and sent to the McCreath Laboratory, where it was discovered that the material thought by Bell to be the high grade material had a .08–.09 carbon content instead of the expected .06 content.[39]

Plaintiff Minerais contends that the two lots were commingled by Turner before or during the payloading and trimming operations. Turner contends that Bell commingled the material based on erroneous stowage information provided by Minerais.

The McCreath analysis, based on samples taken by DeVan sometime between May 30 and June 1, 1990, indicates that, as of the date of sampling, there had been no commingling of the two grades of ferrochrome aboard the Barge ING–4588.[40] The parties dispute the precise date the samples were taken by DeVan: plaintiff contends that they were taken on May 31, or June 1, 1990, before the payloading and trimming operations; defendant contends that they were

taken on June 1, 1990, after the payloading operations. Based on documentary evidence that the samples were taken on May 30 and 31, 1990 [41] and that the hatches of the Barge ING–4588 were closed at 9:00 P.M. on May 31, 1990,[42] I find that the samples were taken on May 30 and 31, 1990, prior to the payloading and trimming operations. Consequently, the actual commingling could have occurred in New Orleans during Turner's payloading and/or trimming operations or in Ohio during Bell's discharge operations.

Based upon the credible testimony of Henry Walker, I find that the commingling did not occur during Turner's trimming operations. However, I am unable to determine from the evidence presented whether the commingling occurred earlier, during Turner's payloading operations, or later, during Bell's discharge operations. Such a determination would be based on little more than speculation. Nevertheless, regardless of where the actual commingling occurred, I find that Turner's failure to use physical separations, mark the barge or pilings, and/or maintain a comprehensible record of how the cargo was stowed was a proximate cause of the commingling.

As a result of the commingling, none of the combined material was of a specification that fell within the higher grade and Minerais was forced to downgrade what would have been a 450 metric ton consignment of high grade material (.06 max. carbon) to low grade material (.10 max. carbon) for purposes of resale.[43]

Although Minerais had sold high grade ferrochrome in the past, the lot of low grade material was the first substantial quantity of low grade material to be shipped to the United States.[44] At the time, the high grade ferrochrome (.06 max carbon content) was

34. Deposition of Paul Vincent, at 30–33, 46, 53; see also Joint Exhibit 25.

35. Joint Exhibit 29.

36. Joint Exhibit 30.

37. Joint Exhibit 30.

38. Deposition of Mark Pease, at 36–37.

39. Joint Exhibits 36, 37.

40. Joint Exhibits 18, 19.

41. Joint Exhibits 18 and 19.

42. Joint Exhibit 14.

43. Deposition of Thomas Mayrides, at 5, 7.

44. Deposition of Thomas Mayrides, at 10, 19. I reject the contrary testimony of defendant's expert, William Carleton, insofar as he refused to submit for the court's examination the sources of his information. I find his testimony, that there had been previous sales of the low grade material in the United States, lacking in credibility and not supported by the documentary evidence.

the recognized, accepted product for the United States industry. It was Minerais' intent to introduce the low grade ferrochrome (.10 max. carbon content) into the marketplace as a viable substitute for the higher grade of material.

At the time of the shipment Minerais had not presold any of the cargo destined for Ohio. Instead, Minerais purchased the material with the intent to carry an inventory of various grades of ferrochrome.[45] The shipment was received on June 29, 1990 and Minerais sold all of the low grade material, including the 450 metric tons of downgraded material, by the end of the first quarter of 1991.

At the time the shipment arrived in the United States in June of 1990, the retail price of high grade ferrochrome (.06 max carbon content), as published in Metals Week,[46] was between $1.10 and $1.23 per pound of contained chromium.[47] Over the next year, however, the price of high grade ferrochrome dropped to a range of $.99 to $1.05 per pound of chromium.[48] Metals Week did not publish prices for low grade ferrochrome (.10 max carbon content) until May 31, 1991, almost a year after the relevant shipment arrived in the United States. As of May 31, 1990, the published retail price for low grade ferrochrome was between $.93 and $.98 per pound of chromium.[49]

Minerais relies on an August, 1990 invoice for the sale of high grade material which was already in Minerais' inventory to establish the market price at $1.15 per pound of chromium for the anticipated lot of high grade material. The invoices relied on by Minerais to establish the market price of low grade material reflect retail prices of between $.99 and $.94 per pound of chromium, depending on the time at which the material was sold. It is unclear which sale accounted for the 450 metric tons of downgraded material.

Defendant's expert in pricing, sales and marketing of ferrochrome, William F. Carleton, performed a study of the market and price of low carbon ferrochrome in the United States in 1990 to 1991. Carleton testified that his study consisted of a review of the Metals Week prices, Minerais invoices reflecting wholesale and retail prices and his personal files as director of marketing for a metals company, as well as consultation with colleagues in the industry. Based on his study, he suggested a retail price of between $1.13 and $1.15 per pound of contained chromium for the high grade material and a price of between $1.01 and $1.10 for the low grade material. I find these figures unreliable insofar as they are not corroborated by the Metals Week prices and Carleton refused to submit his other sources for the court's examination.

I find the Metals Week prices the most reliable evidence of the market price of ferrochrome in 1990 and 1991. However, in light of the declining market, and because it is impossible to determine the date by which Minerais would have sold the anticipated 450 metric tons of high grade material, I find it impossible to assign a market value to the relevant lot of high grade material for purposes of calculating damages.

Similarly, because Metals Week did not publish prices for the low grade material until May of 1991, and it is unclear which, if any, of Minerais' invoices account for the downgraded portion, I likewise am unable to assign a market value to the low grade material for purposes of calculating damages.

## II. Conclusions of Law

### A. Jurisdiction

Jurisdiction is proper under the Court's admiralty jurisdiction, 28 U.S.C. § 1333.

45. Deposition of Thomas Mayrides, at 18–19.

46. Metals Week, a weekly publication that lists prices for various metal products and alloys, is the only source of published data. The range of prices listed in Metals Week for various products is based on information gathered from suppliers, consumers, and traders in the industry. Deposition of Thomas Mayrides, at 7–8; Testimony of William Carleton.

47. Joint Exhibits 46, 56.

48. Id.

49. Id. Alloys are priced on two different bases, sometimes on a "per pound" basis and sometimes on a "per pound contained chromium" basis. For purposes of this case, the ferrochrome was priced according to the latter method.

Venue is properly laid in the Eastern District of Louisiana. 28 U.S.C. § 1391.

### B. Liability

 Plaintiff relies on Turner's breach of the implied warranty of workmanlike performance and/or negligence to establish Turner's liability. Under both the contract-based warranty of workmanlike performance and tort principles, stevedores are obliged to exercise ordinary diligence in loading, stowing and discharging cargo, and are liable for the damage proximately caused by their negligence. *Agrico Chemical Co. v. BEN W. MARTIN*, 1985 A.M.C. 563, 572, 664 F.2d 85 (5th Cir.1981). Plaintiff must prove a violation of this duty by a preponderance of the evidence. *Skidmore v. Grueninger*, 506 F.2d 716 (5th Cir.1975).

 While the evidence is not sufficient to establish Turner as the party who actually commingled the two lots of ferrochrome, it is sufficient to establish Turner's negligence in stowing the cargo and that this negligence was a proximate cause of the commingling. Turner employees testified that they were aware that the two lots of cargo, although identical in outward appearance, were different in composition and therefore were to be kept separate on the barge. Nevertheless, the sole precaution Turner took to separate the lots and to prevent commingling was to separate the two lots by some amount of open space.[50]

Turner contends that its conduct satisfies the standard of care imposed on stevedores because separating similar lots of cargo by open space alone is an accepted custom in the stevedoring industry. Several witnesses testified on this issue. Larry Deas, manager of the New Orleans office of DeVan Inspection Company, testified that in stowing two different grades of material on the same barge, one type of precaution used to prevent commingling of such cargo is to leave space between the different lots; another method is to use wood partitions. Henry Walker of Turner testified that Turner customarily separates lots of cargo by leaving a space between them, unless instructed to provide some form of a barrier. Paul Vincent, the terminal manager of S.H. Bell Company, East Liverpool, Ohio, testified that it is not uncommon for barges to arrive at his facility containing two lots of similar cargo without a physical barrier between the two lots.

 In determining the reasonableness of conduct, what is customary practice may nevertheless amount to failure to exercise reasonable care under the circumstances of a particular case. *United Barge Co. v. Notre Dame Fleeting & Towing*, 568 F.2d 599, 604 (8th Cir.1978). What ought to be done is fixed by a standard of reasonable prudence, whether it is usually complied with or not. *United States v. M. Levy's Sons*, 288 F. 544, 546 (5th Cir.1923). One way to determine what is reasonable under the circumstances is to balance the probability and gravity of the risk involved against the burden of taking additional precautions to prevent the risk from becoming a reality.

Here, the probability that the two grades would be commingled was fairly strong considering that they were indistinguishable to the naked eye, were separated on the barge only by open space, and Turner did not have a thoroughly comprehensible record[51] of how and where the cargo was stowed on the barge. The risk, if it occurred, would be fairly serious—commingling might cause contamination and/or reduction in the value of the cargo. Finally, the burden of taking additional precautions, such as using physical barriers, pile or barge markings, and/or

---

**50.** The evidence suggests that there were between twelve and twenty feet of space between the two sets of piles.

**51.** Although the drawing in the superintendent's log suggests that the two lots were distinguishable based on their difference in quantity (as reflected by the number of piles for each lot), I find the drawing, coupled with the references to where the cargo came from on the ship, confusing and potentially misleading. The references to where the cargo had been stowed on the ship could easily have been read by someone other than the illustrator to indicate where the two lots were stowed on the *barge*. So interpreted, it would appear from the superintendent's log that the larger lot (the low grade material) was stowed in the "aft" (stern) and the smaller lot (the high grade material) was stowed at the other end, the bow. The actual placement is unclear from the evidence presented.

maintaining a precise record, was minimal. As the loading stevedore, Turner was in the best position to adopt measures that would prevent damage to the cargo. *Gator Marine Service Towing v. J. Ray McDermott & Co.,* 651 F.2d 1096, 1100 (5th Cir.1981); *Nissho–Iwai American Corp. v. M/S MARITIME UNITY,* 1983 A.M.C. 2149, 2158 (E.D.La. 1983). Turner relied on space between the two lots and the different quantities of the cargoes to indicate that they were separate and different. I find that a reasonable stevedore would have employed more effective measures than those employed by Turner.

Turner seeks to place all or part of the responsibility on Minerais and/or Bell. As the owner and shipper of the cargo, Minerais was aware of the nature of the cargo and made the decision to transport the two lots of ferrochrome on the same vessel from Turkey to New Orleans and on the same barge from New Orleans to Ohio. In doing so, Minerais instructed Turner to keep the two lots separate on the barge and not to commingle them. I find that Minerais exercised sufficient care in instructing Turner on the characteristics of the cargo and how to handle the cargo, and could rely on the expertise and responsibility of Turner's stevedores to take the necessary measures to prevent commingling.

Neither do I find unreasonable Minerais' actions after Bell notified Minerais that there was confusion about the stowage. Turner contends that Minerais should have had the cargo sampled and analyzed while the cargo was still aboard the barge in Ohio. Turner's expert Captain Ronald Campana testified concerning the proper handling of discharge operations when there is doubt about how cargo is stowed. Campana suggested several ways of handling the situation, including (1) refusing to discharge the cargo until the confusion is eliminated, (2) consulting the loading stevedore to find out stowage information, (3) discharging separate lots and having them sampled and analyzed on shore, and/or, if worse comes to worst, (4) having the cargo sampled and analyzed while it is still on board the barge. He pointed out, however, that the problem with taking too much time to do any of these things is that too much delay could result in demurrage charges.

Here, Minerais consulted Turner for stowage information and conveyed that information to Bell. The accuracy and clarity of that information was questionable. Nevertheless, based on Bell's assurances that the information clarified the stowage situation, Minerais instructed Bell to discharge the cargo and, once on shore, Minerais had the separate bins of cargo sampled and analyzed.

In determining whether Minerais' actions were reasonable, I must keep in mind that the necessity for decisionmaking was thrust upon Minerais by Turner, and therefore Minerais should be given some latitude in determining how to handle the situation. As the shipper, Minerais had a duty to mitigate its damages, i.e., to avoid incurring additional expense and demurrage charges. I find, therefore, that Minerais' decision to wait until the cargo was discharged to have it sampled and analyzed was reasonable. Nor do I find Minerais negligent in failing to contact its surveyor for any stowage information it might have in its possession. In light of the extreme pressure under which Minerais was acting, Minerais handled the situation as reasonably as could be expected under the circumstances.

Defendant has not proved any negligence on the part of Bell in discharging the cargo. As previously recognized, it is possible that Bell was the party that actually commingled the cargo. However, Turner has not proved it did so by a preponderance of the evidence. A finding of fault on the part of Bell would be based purely on speculation.

Accordingly, I find Turner's negligence to be the sole proximate cause of the commingling.

### C. Damages

Minerais seeks damages in the amount of $148,619.37 as a result of this incident. This amount includes $146,584.29 in profits Minerais lost by reselling the 450 metric tons of product as low grade material as opposed to high grade material, four months of storage expenses at $1,289.60, and sampling and analysis costs of $745.48. Turner objects to

the storage costs and to Minerais' calculation of its economic loss, but has made no objection to the sampling and analysis costs.

With regard to Minerais' economic loss, the general rule for assessing damage to cargo is the difference between the market value of sound goods at the port of destination and the market value of the goods in their damaged condition. *C. Itoh & Co. v. M/V Hans Leonhardt,* 719 F.Supp. 479, 509 (E.D.La.1989); *Holden v. S/S Kendall Fish,* 262 F.Supp. 862, 864 (E.D.La.1966), *aff'd,* 395 F.2d 910 (5th Cir.1968). Market value, however, is only one method of ascertaining the loss to the shipper, and the court is free to use an alternative approach where other, more accurate means are available for measuring the actual loss. *Illinois Central Railroad Co. v. Crail,* 281 U.S. 57, 64–65, 50 S.Ct. 180, 181, 74 L.Ed. 699 (1930); *Dixie Plywood Co. v. S.S. Federal Lakes,* 404 F.Supp. 461, 465 (S.D.Ga.1975), *aff'd,* 525 F.2d 691 (5th Cir.1975), *cert. denied,* 425 U.S. 974, 96 S.Ct. 2174, 48 L.Ed.2d 798 (1976). Moreover, the plaintiff bears the burden of proof on the extent of the damages it seeks to recover.

Minerais contends that there is sufficient evidence for the court to calculate the damages based on a difference in fair market value. However, I find the proof insufficient to support such a calculation. With regard to the market value of low grade ferrochrome, Metals Week, the only publication

that lists market prices for ferrochrome, did not publish a range of prices for low grade material until May 31, 1991, almost a year after the relevant shipment.[52] Minerais correctly points out that in the absence of a readily available market quotation, the court may look to invoice prices to determine market value. *Emmco Ins. Co. v. Wallenius Caribbean Line, S.A.,* 492 F.2d 508, 514 (5th Cir.1974). However, the evidence indicates that Minerais' shipment of ferrochrome was the first substantial shipment of this material to the United States, and it was plaintiff's intent to create a market for it. Minerais had not presold any of the low grade material. Although Minerais managed to sell all of the low grade material by May of 1991, it sold it in varying quantities for various prices.[53] It is unclear from the evidence precisely which sale accounted for the 450 metric tons of downgraded material.[54] Under these circumstances, I decline to rely on an invoice price to establish the market value of the low grade material.[55]

Even assuming I could assign a market value to the low grade material, plaintiff has not established a market price for the high grade material. The cases on which Minerais relies involve presold goods which were damaged in transit. The invoice on which Minerais relies to prove a market price of $1.15 per pound chromium for the high grade material is an August 3, 1990 invoice for the sale of approximately 20 metric tons of high

---

**52.** In May of 1991, Metals Week published a price range of between $.93 and $.98 per pound chromium for the low grade material. Joint Exhibits 46, 47, 56.

**53.** Minerais introduced into evidence a June 25, 1990 invoice for the sale of 160 metric tons of low grade material at a price of $.99 per pound chromium and a July 29, 1990 invoice for the sale of 400 metric tons of the low grade material at the same price. Minerais also introduced into evidence an October 3, 1990 invoice for the sale of 300 metric tons of low grade material at a price of $.94 per pound chromium. Finally, Minerais' evidence includes an October 30, 1990 bid on 450 metric tons of low grade material as "salvage" at a price of $.45 per pound chromium. The remaining inventory of the low grade material was sold in the first quarter of 1991, but Minerais presented no evidence on the price at which this material sold.

**54.** Minerais does not explain its reliance on the October 3, 1990 invoice as reflecting the market

price of the low grade material in 1990 and 1991.

**55.** Defendant's evidence of market value is no less speculative than plaintiff's. Turner relies on the testimony of its expert, William Carleton, to establish a market price of between $1.01 and $1.10. Mr. Carleton contends that, in spite of the absence of published prices in Metals Week, there was already a market for low grade material in the United States and there had been sales of the low grade material prior to the sales by Minerais in 1990 and 1991. However, Mr. Carleton refused to identify these "other" sales or to submit for my examination the information on which he relied to make his findings. Consequently, I give no weight to his testimony. I assess damages based on the value of the goods as shown by their actual market value, not on what that value should have been under criteria devised by an expert witness.

grade material which was in Minerais' inventory prior to the relevant shipment. There is no invoice for the 450 metric ton lot of high grade cargo that was being shipped to Ohio because Minerais had not presold any of that material; instead, Minerais planned to store the cargo at the Bell facility until it found a buyer. According to Metals Week, the average market price of high grade ferrochrome in June of 1990 was $1.15 per pound chromium. However, the market declined over the next year, and by June of 1991 the average market price for high grade ferrochrome had dropped to $.985.[56]

Although Minerais' invoice price of $1.15 is corroborated by Metals Week as the price of high grade material in the summer of 1990, it is unclear from the evidence the precise date by which plaintiff, in all likelihood, could have sold the anticipated 450 metric tons of high grade ferrochrome. The existence of a fluctuating market in 1990 and 1991 and the fact that Minerais had not presold any of the 450 metric ton lot of high grade material undermines the valuation by invoice urged by Minerais, and any assignment of the market value of high grade material would be based entirely on speculation.[57]

Accordingly, I find that Minerais has failed to establish the fair market value as the appropriate measure of calculating Minerais' economic loss.[58]

■ However, in light of my findings that Turner is liable for the commingling of the cargo, I am of the opinion that plaintiff is entitled to some compensation and that, under the circumstances, an application of the difference in the wholesale value of the two grades of ferrochrome is the only reliable measure of damages. It is beyond dispute that Minerais paid for 450 metric tons of high grade material and, due to the commingling

of the two grades, ended up with 450 metric tons of low grade material for purposes of resale. Thus, due to Turner's negligence, Minerais did not receive what it paid for, and is entitled, at a minimum, to be reimbursed for the difference in wholesale value. The wholesale value of the two lots is evidenced by the Ronly invoices, which indicate a difference of $.0294 per pound of chromium. Accordingly, Minerais' economic loss, calculated on a wholesale differential, amounts to $21,811.[59]

■ With regard to the charge of $1,289.60 for unanticipated storage costs, I find that Minerais has failed to meet its burden. Minerais contends that the commingling of the two grades of ferrochrome extended its inventory of low grade ferrochrome by 450 metric tons and resulted in a delay in the normal sales pattern for the low grade material. This is entirely speculative. No evidence on the normal turnover rate for the low grade material exists for the relevant time period, considering that the June 1990 shipment was the first substantial amount of low grade ferrochrome to enter the United States. Accordingly, I find that because Minerais had no way of knowing how long it would take to sell the material in the United States market, it cannot prove unjustified storage charges.

■ Turner has made no objection to the sampling and analysis expenses, and I conclude that Minerais has carried its burden of proof respecting the $745.48 in sampling and analysis charges.

I also award Minerais prejudgment interest from the date of the loss, June 29, 1990. *Reeled Tubing, Inc. v. M/V CHAD G.*, 794 F.2d 1026 (5th Cir.1986). I fix the rate of prejudgment interest at 8.09% (the T–Bill

---

**56.** Joint Exhibits 46, 47, 56 (Metals Week prices for June 29, 1990 and June 28, 1991).

**57.** Again, I decline to rely on the figures presented by defendant's expert William Carleton. They are not consistent with the Metals Week prices, and Carleton refused to submit for the court's examination the other sources on which he relied.

**58.** I also decline to rely on the depreciation discount presented to Minerais' insurer. At trial, I

found the evidence establishing that discount, which apparently was rejected by the insurer in any event, probative only of the fact that a claim was made. It is inadmissible to prove anything beyond that. Joint Exhibits 39, 40, and 44.

**59.** The calculation is made as follows: [450 metric tons × 2204.6 × 70.53% × $.7644] − [450 metric tons × 2204.6 × 70.36% × $.735] = $21,811.00.

rates compiled in the Clerk's office of the United States District Court for June 28, 1990—July 25, 1990), compounded annually. There is no evidence in the record to support Minerais' contention that prejudgment interest should instead be set at the state statutory rate of 9.0%.

Accordingly,

IT IS ORDERED that there be judgment against defendant Turner in favor of plaintiff Minerais for damages in the sum of $22,556.48, plus prejudgment interest from June 29, 1990 to date at the rate of 8.09 percent, compounded annually.

## MEMORANDUM AND ORDER AMENDING JUDGMENT

On March 28, 1994 judgment was entered in this matter in favor of plaintiff, Minerais U.S., Inc. ("Minerais") and against defendant Turner Marine Bulk, Inc. ("Turner") in the amount of $22,556.48 plus prejudgment interest from June 29, 1990 at the rate of 8.09 percent, compounded annually. In the Findings of Fact and Conclusions of Law entered on March 24, 1994, I found Turner's negligence to be the sole proximate cause of the commingling of Minerais' cargo. However, I neglected to address the issue of costs. Minerais now seeks to have the judgment amended to award costs to it as the prevailing party.

*Discussion*

Rule 54(d) of the Federal Rules of Civil Procedure provides that "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." Fed. R.Civ.P. 54(d). While the rule does not prevent the court, in its discretion, from requiring a prevailing party to bear its own costs, "the language of the rule reasonably bears the intendment that the prevailing party is prima facie entitled to costs and it is incumbent on the losing party to overcome that presumption ... [since] denial of costs ... is in the nature of a penalty for some defection on his part in the course of the litigation." *Walters v. Roadway Express, Inc.,* 557 F.2d 521, 526 (5th Cir.1977) (citations omitted); 10 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2668, at 201 (West 1983).

Turner maintains that the court should exercise its discretion to deny costs to Minerais because Minerais was not the "prevailing party" in this litigation. Turner bases this argument on the fact that while Minerais sought approximately $150,000.00 in damages, the judgment in Minerais' favor was for a sum of approximately $22,000.00, or only 15 percent of the damages it claimed. Whether a party is the "prevailing party" for purposes of Rule 54(d) is determined as a practical matter. *Schwarz v. Folloder,* 767 F.2d 125, 130 (5th Cir.1985). Because I found Turner's negligence the sole proximate cause of the commingling of Minerais' cargo and awarded damages, Minerais is clearly the "prevailing party" in this litigation and is entitled to costs. The disparity in the amount sought by Minerais and the amount of damages ultimately proved by Minerais is not grounds to sanction Minerais by denying costs in this matter.

Accordingly,

IT IS ORDERED that the judgment entered on March 28, 1994 is amended to read as follows:

IT IS ORDERED that there be judgment in favor of plaintiff Minerais U.S., Inc. and against defendant Turner Marine Bulk, Inc. in the amount of $22,556.48 with interest from June 29, 1990 at the rate of 8.09 percent, compounded annually, plus costs.