669 So.2d 476 (1996)
Johnny Ray OLIVIER
v.
BEST WORKOVER, INC., and Texaco, Inc., et al.
No. 94-CA-994.
Court of Appeal of Louisiana, Fifth Circuit.
January 30, 1996.
Order Granting Rehearing in Part March 18, 1996.
*480 Lance R. Rydberg, Christovich & Kearney, L.L.P., New Orleans, for Defendant/Appellant Best Workover, Inc.
Hoffman, Sutterfield, Ensenat & Bankston A Professional Law Corporation, Daniel A. Webb, Catherine A. Mills, New Orleans, for Defendant/Appellant Texaco, Inc.
Alexander N. Breckinridge, IV, Alfred J. Rufty, O'Neil, Eichin, Miller, Breckinridge & Saporito, New Orleans, for Defendant/Appellant Sigma Welders & Fabricators, Inc.
Louis G. Schott, Borrello, Huber & Dubuclet, Metairie, for Intervenor/Appellant Liberty Mutual Insurance Company.
Lawrence A. Arcell, New Orleans, for Plaintiff/Appellee Johnny Ray Olivier.
Before BOWES, GAUDIN and CANNELLA, JJ.
CANNELLA, Judge.
This appeal is brought by all of the parties in an admiralty personal injury case. The plaintiff, Johnny Ray Olivier, filed a petition for personal injuries on September 11, 1989 against his employer, Best Workover, Inc. (Best) under the Jones Act and general maritime law. He added Best's insurers, Certain Underwriters at Lloyds London (Certain Underwriters) and Albany Insurance Company (Albany) in 1993. Plaintiff also filed suit against Texaco, Inc. (Texaco) under the general maritime law in September of 1989. In 1990, plaintiff added welder, Alton Trout, and Sigma Welders & Fabricators, Inc. (Sigma) as defendants on the basis of negligence. Various pleadings, exceptions, cross-claims, third-party actions and motions for summary judgment were filed by defendants. Texaco filed a cross-claim against Best, Albany and Certain Underwriters. Best filed a third-party claim against Sigma. Sigma then filed cross-claims against Texaco and Best. Certain Underwriters filed a third-party demand against Sigma. In addition, in 1991, Liberty Mutual Insurance Co. (Liberty Mutual) intervened for benefits it paid to plaintiff. Albany settled with the plaintiff. A judge trial was held on May 31, June 1 and June 2, 1994. On May 31, 1994, Best and Underwriters stipulated that Texaco would be entitled to contractual defense and indemnity by Best, in accordance with their insurance policy and the Texaco/Best Master Work Agreement. On July 19, 1994, judgment was rendered in favor of plaintiff, awarding him $290,081.29 plus costs and prejudgment interest from date of judicial demand, against defendants Sigma, Best and Texaco. In oral reasons for judgment, the trial judge divided the award as follows: $125,000 for past and future wages, $150,000 for pain and suffering, $5,081.29 for past medical expenses and $10,000 for future medical expenses. The trial judge found Sigma 40% at fault, Best 40% at fault and Texaco 20% at fault. He dismissed the cross-claims and the intervention. In oral reasons, the trial judge determined that Sigma was the employer of Alton Trout and vicariously liable for Trout, who was negligent under the duty/risk analysis. The trial judge found Best liable for negligence under the Jones Act and for unseaworthiness of the vessel due to its' control over the rig placed atop the barge. The trial judge concluded that Texaco was also liable for unseaworthiness as the owner of the barge. We affirm in part, reverse in part, amend in part and affirm as amended.

*481 FACTS:
In 1988, Best was engaged in the business of providing oil field services to various oil companies in South Louisiana and Texas. It's primary business was performing "work-overs" of oil wells, such as maintenance, repair work and occasional additional drilling on existing oil and gas wells. It also performed "plug and abandon" work on existing wells. The latter involves closing out old unused oil and gas wells by cutting and removing the oil well casing below the surface, or the mud line, where the well is drilled in a water bottom and capping perforations with cement.
In August of 1988, Best and Texaco entered into a Master Services agreement for Best to perform workover and plug and abandon work for Texaco in certain South Louisiana oil and gas fields. As a result of the agreement, Best supplied a workover drilling rig (Best 15) and various other equipment, such as living quarters, a crane and various pumps. These items were mounted or built on the Texaco barge, 12-15 feet above the floor of the barge. Best retained ownership of the rig and appurtenances. Texaco retained ownership of the barge and was responsible for moving it from place to place, as needed. Construction or mounting of the equipment and buildings was done partially before the move to the first well at the Texaco slip on the Intracoastal Waterway in Houma, Louisiana, partially during the move and partially when the barge reached its first destination in the Bay St. Elaine area, which is located in in-shore waters. Best also supplied the crew for the operations. Among others, plaintiff was hired by Best as an operator/driller on August 23, 1988. Plaintiff was an experienced oil field worker. He had been a roustabout or floor hand, a driller and a toolpusher (supervisor). For this job, he assisted in the installation of the equipment aboard the barge and in preparing the equipment for use in the operations.
In order to "rig up" the rig and appurtenances, Best required a welder. As customary, Best contacted an outside company, in this case, Sigma, to provide a welder to "weld as directed". Sigma supplied Best with Alton Trout, an experienced oil field welder. Over the course of three or four days, Trout performed several welding jobs. One of the jobs was the construction of a post and cable handrail around the perimeter of the raised portion of the rig located twelve to fifteen feet above the floor of the barge. The handrail consisted of cable strung through a hole drilled into the top portion of vertical pipes, approximately one and one-half inches in diameter and three and one-half feet to four feet tall. The pipe, spaced at intervals, was welded into the I-beam comprising part of the support structure of the rig.
After arriving at the first destination, the crew began setting up the rig and barge to perform the workover or plug and abandon work. However, before the work proceeded very far, the crew was informed that a storm was approaching and Texaco ordered the barge evacuated. On September 9, 1988, the crew was in the process of tying the rig and equipment down in preparation for the storm before evacuating the rig, when plaintiff fell from the rig floor to the barge deck. He was attempting to catch a coil of wire or cable which was being thrown up to him from below by a co-worker, Frank Carroll. Plaintiff tried to catch the coil in one hand while balancing himself on the edge of the platform with the other hand by holding onto the handrail pipe. He fell when a vertical pipe pulled loose from its defective weld on the I-beam. Plaintiff fell forward landing on his back on the fuel tank below. His fall was partially broken by Carroll, who tried to catch him and whose arm was pinned to the fuel tank by plaintiff.
Plaintiff was taken to Terrebonne General Medical Center where he was diagnosed with 20% compression fractures of two vertebrae. He was hospitalized for four days. He was treated for this condition and eventually for a herniated disc over the next several years. At time of trial, his back problems had not fully resolved and he was considered a candidate for back surgery.

STANDARD OF REVIEW
In maritime cases, the factual findings of the trial court are subject to review under the same manifest error standard as applied by Louisiana courts. Gaston v. G & *482 D Marine Services, Inc., 93-0182 (La.App. 4th Cir. 1/19/94), 631 So.2d 547, 552; writ denied, 94-0436 (La. 4/4/94), 635 So.2d 1112. Under that standard of review, the appellate court may not set aside a finding of fact by the trial judge or jury unless it is manifestly erroneous or clearly wrong. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099, 93-3110, 93-3112 (La. 7/5/94), 639 So.2d 216, 220. That does not mean that the reviewing court can virtually never upset the trial court findings. Id. at 221. But, after giving great deference to the factfinder, the reviewing court has every right to determine whether the trial court's verdict "was clearly wrong based on the evidence, or clearly without evidentiary support." Ambrose, 639 So.2d at 221.

INDEPENDENT CONTRACTOR
Sigma presents one issue on appeal. It contends that Trout was an independent contractor, not an employee, over whom it had no control. Sigma asserts that the trial judge erred in relying solely on the testimony of Trout to reach his conclusion that he was an employee for whom Sigma is vicariously liable.
Under La.C.C. art. 2320, the master or employer is responsible for the damage occasioned by their servants in the exercise of the functions in which they are employed. Liability only attaches, however, when masters or employers, teachers or artisans, might have prevented the act which caused the damage and have not done it. C.C. art. 2320. Louisiana jurisprudence has not defined the latter phrase, but has drawn freely from the common law in "applying the general code principles to concrete master-servant problems", since both are based on Roman law and the history and development of the doctrines are similar." Ermert v. Hartford Insurance Co., 559 So.2d 467, 475-476 (La1990). The concepts of respondeat superior to impose vicarious liability and independent contractor as an exception to vicarious liability were borrowed from the common law. Guidry v. Freeman, 555 So.2d 588 (La. App. 1st Cir.1989).
Before C.C. art. 2320 can apply, plaintiff must show the existence of the employment relationship. Poynor v. Cure, 443 So.2d 1151 (La.App. 5th Cir.1983), writ denied, 446 So.2d 1225 (La.1984); Hickman v. Southern Pacific Transport Company, 262 La. 102, 262 So.2d 385, 391 (1972). The right of control is the single most important factor in determining an employment relationship. Poynor, 443 So.2d at 1155. It is not the supervision and control that is actually exercised which is significant, but whether the right to do so exists. Hickman, 262 So.2d at 391.
In determining the right of control, the court must consider several factors in the relationship. Poynor, 443 at 1156. Whether a party is an employee or independent contractor depends upon an analysis of these elements according to the particular facts of each case. Id. at 1156. Included among the factors is the total economic relationship between the parties. Adams v. Greenhill Petroleum Corporation, 93-795 (La.App. 5th Cir., 1/25/94), 631 So.2d 1231, 1233, writ denied, 94-0477 (La. 4/4/94), 635 So.2d 1114. As stated in Hickman,
It is well understood by the courts of this State that the term independent contractor connotes a freedom of action and choice with respect to the undertaking in question and a legal responsibility on the part of the contractor in case the agreement is not fulfilled in accordance with its covenants.
Hickman, 262 So.2d at 390. The court then set forth the characteristics of the independent contractor relationship:
1. The existence of a valid contract;
2. The independent nature of the contractor's business such that the contractor may employ non-exclusive means to accomplish it.
3. The contract calls for specific piecework as a unit to be done according to the independent contractor's own methods without being subject to the control and direction of the employer, except as to the result of the services to be rendered.
4. A specific price for the overall undertaking is agreed upon.
5. The duration is for a specific time and not subject to termination at the will of *483 either party without a corresponding liability for its breach.
Id. at 390-391; See also: Smith v. Zellerbach, 486 So.2d 798, 801 (La.App. 1st Cir. 1986); Guidry v. Freeman, 555 So.2d 588, 593 (La.App. 1st Cir.1989); Richard v. Teague, 92-17 (La.App. 3rd Cir. 5/4/94), 636 So.2d 1160, 1172.
The evidence in this case shows that Alton Trout signed a Master Services Agreement with Sigma which states that he is an independent contractor. The agreement also required Trout to obtain insurance. Trout testified, however, that he signed the agreement because, as old as he was, he needed the work and that he never obtained any insurance because he could not afford it. Trout further testified that he did 90% of his work for Sigma, but also did work for another company. He stated that when he went into the field, he was not hired to do a specific job, but was expected to do whatever welding work was required. Trout testified that Sigma did not tell him how to perform his job. He was paid weekly by Sigma, no matter how many jobs he performed that week, and he used a Sigma time ticket on which he recorded his hours and the type of work he performed. His pay rate was established when he was first "hired" by Sigma through an oral side agreement. No taxes were deducted from his check and he received an Internal Revenue Service 1099 form from Sigma at the end of each year. Trout stated that he carried Sigma business cards. He noted that sometimes he used his own vehicle to go to the job and he was paid mileage from his home. Mileage was also established by the oral side agreement to the Master Services Agreement. For land jobs, he used the Sigma truck, which had welding equipment installed on it.
In regard to this particular job, Trout stated that someone from the Sigma office called him and told him to report to the Best supervisor at the barge at the Texaco dock. The work involved "rigging" the rig and he was needed to do whatever Best required. He further testified that the Best employee told him what to do and Best supplied the welding machine and rods. He only supplied his welding hood and some small hand tools. Trout stated that he could be dismissed from the job by the Texaco or Best toolpusher, if he was not performing satisfactorily. When he checked in with the toolpusher, he said that he was the welder from Sigma. Furthermore, he testified that he worked in the rain because he did not believe that he was free to stop working until he was told so by the Best supervisor. He was also provided a Best worker to assist him in building the defective handrail that caused plaintiff's injuries.
The President of Sigma, Russell Gros, testified that the company employed several welders, office staff and welder helpers. However, when his employees were not available, the company sent out contract welders to the company's customers. He testified that the contract welders were paid hourly and that the rate of pay was agreed upon for a specific job. Gros claimed that Trout was used from time to time, but he could refuse any job. He contended that Sigma had no control over how Trout performed the work. Gros stated that the Master Services Agreement set out the general agreement, but there was an oral agreement for each specific job. He testified that Trout was supposed to keep track of his time and mileage and that he presented Sigma with a Sigma work ticket at the end of the job. He said that the work ticket was used to document the costs for the customer's invoice and was attached to the invoice. Trout was then paid according to the hours and mileage recorded. He stated also that Trout was paid before the customer paid Sigma.
Gros testified that Best wanted a welder to work as directed and that Best maintained control of the work. He stated that Sigma did not control the manner of the work, did not communicate with Trout and did not supply his welding equipment (welding machine, oxygen, acetylene, cutting tools, welding rods, etc.). Gros contended that Trout had his own tools, according to the invoice sent to Best. He claimed that he could not fire Trout, but he could replace him if the customer was not satisfied. He noted that Trout sometimes used the Sigma truck when the customer requested Sigma to provide the equipment and that Trout had access to the *484 truck keys. On cross-examination, he testified that it was less expensive to send out a contract welder because Sigma did not have to pay any taxes for them.
Darryl Brewer, President of Best, testified that the company did not have a welder, so it requested welders from welding companies, such as Sigma.[1] He stated that the welder was hired to do whatever work was necessary. Brewer asserted that Sigma did not inform anyone from Best that Trout was an independent contractor. Brewer stated he contacted Sigma because he wanted someone with expertise and insurance coverage, otherwise he would not have allowed the welder to work on the project.
Trout and Sigma executed a contract which declares Trout to be an independent contractor. However, Trout testified that he signed the contract because he needed "the job". Regardless, there does exist a valid contract and the first element of independent contractor status under Hickman is met.
The second condition requires that the work is of an independent nature such that the contractor may employ non-exclusive means to accomplish the work. Here, Trout was told by Sigma where and when to report and what to do when he got there. When he arrived at the job site, he identified himself as a Sigma welder. At the time of trial, he had worked for Sigma for six years and carried Sigma business cards. He used a Sigma work ticket and was paid by Sigma before the customer was invoiced. Sigma, not Trout, billed the customer.
When he arrived at the job, the Best employees instructed him what job to perform. He was assisted by a Best employee and he did not feel free to stop working although the weather was bad and he was forced to weld in the rain. These factors indicate that the second prong of independent contractor status was not met.
The third element of independent contractor status requires that the contractor perform specific piecework as a unit, to be done without the supervision or control of anyone, except as to the result. Here, neither the Master Services Agreement nor the oral side agreements provided for specific piecework to be done as a unit. On the Best job, Trout was told what job to perform by Best. He worked at their will. He was expected to perform work on any number of jobs while aboard the barge and rig. As a result, we find that the third factor is not met.
In regard to the fourth and fifth conditions, the evidence shows that there was no specific price for the overall undertaking. Trout was paid hourly for every job on which he went at the direction of Sigma. Further, there was no agreed upon specific duration for the performance of the work. In addition, neither Trout nor Sigma felt that they would be liable for breach of contract if Trout quit or was relieved of his duties by Sigma. Thus, the fourth and fifth conditions under the Hickman test are not met.
In addition, Sigma held itself out to third parties as the employer of Trout. Best would not have allowed Trout on the rig if it had known that Sigma did not consider itself to be his employer and that Trout was not insured. Best contends in its brief that it did not need Sigma if it wanted to hire an independent contractor welder. Best could have done so itself. Thus, we find that the trial judge was not clearly wrong in finding that Trout was an employee of Sigma and in finding that Sigma was vicariously liable for Trout's negligent act which caused plaintiff's injuries.

PARTY LIABLE FOR UNSEAWORTHINESS
Both Texaco and Best assert that the trial judge erred in finding each of them to be liable for unseaworthiness. Texaco claims that Best had control of the entire barge and rig attached to it, so it was the "vessel owner" for purposes of liability for unseaworthiness. Best claims that Texaco was the "vessel owner" because it owned the barge and maintained control. Both also contend that the vessel was not unseaworthy.
Plaintiff's claims for unseaworthiness are separate from his claims of negligence. Youn v. Maritime Overseas Corporation, 605 So.2d 187, 198 (La.App. 5th Cir. *485 1992, modified on other grounds, 623 So.2d 1257 (La.1993). Under the general maritime law, a shipowner has the absolute duty to provide the crew with a seaworthy vessel. Id. The vessel and all of the appurtenances and crew must be reasonably fit and safe for their intended purpose, otherwise, the vessel is unseaworthy. Youn, 605 So.2d at 198. The vessel owner's actual or constructive knowledge of the unseaworthy condition, his lack of due diligence or his negligence are not necessary to support liability, because his duty to provide a seaworthy vessel is absolute. Id. However, in order to prevail on the unseaworthiness claim, plaintiff must prove that the vessel was unseaworthy and that the unseaworthy condition was the proximate cause of the injury. Youn, 605 So.2d at 198.
In order to escape liability for unseaworthiness, the vessel owner must show that he has delivered a seaworthy vessel to a "bareboat" or "demise" charterer. The bareboat charterer is considered the owner pro hac vice of the vessel for liability purposes. Backhus v. Transit Cas. Co., 532 So.2d 447, 449 (La.App. 1st Cir.1988). Thus, if the charter is a bareboat charter, then the charterer is responsible for all damages arising from the operation of the vessel. Cantrelle v. Kiva Const. & Engineering, Inc., 630 So.2d 265, 273 (La.App. 1st Cir.1993).
In order to create a bareboat charter, the owner must completely and exclusively relinquish "possession, command and navigation" of the vessel to the charterer. Agrico Chemical Co. v. M/V Ben W. Martin, 664 F.2d 85, 91 (5th Cir.1981); Backhus 532 So.2d at 449. The bareboat charter is "just short of, an outright transfer of ownership". Guzman v. Pichirilo, 369 U.S. 698, 82 S.Ct. 1095, 8 L.Ed.2d 205 (1962). It need not be in writing and control is the critical issue to determine whether a bareboat charter exists. Agrico Chemical Co, 664 F.2d at 91; Backhus, 532 So.2d at 449. A vessel may also be chartered for a single voyage (voyage charter) or for a fixed period of time (time charter), but regardless of whether the charter is a time charter or voyage charter, if the owner retains control, he remains liable for all damages arising out of its operation. Id.
The evidence in this case shows that Texaco, the owner of the barge, maintained responsibility for the movement and navigation of the vessel. Best could not move the vessel without Texaco. Furthermore, although Texaco hired Best to perform the work, a Texaco representative was expected to board the vessel, after the rig was established, to check on or oversee the operations. Clearly, Texaco did not relinquish control of the vessel to Best.
The trial judge concluded that both Texaco and Best were liable because Best controlled the operations and Texaco retained control of the vessel. However, we find no authority in the law of admiralty to support a finding that a contractor can be held liable for unseaworthiness with the shipowner, when the contractor has not chartered the ship under a demise or bareboat charter. The test for the unseaworthiness liability of Texaco or Best is whether Texaco relinquished complete control of the vessel to Best. Agrico Chemical Co. 664 F.2d at 91; Backhus, 532 So.2d at 449. Since Texaco did not do so, it alone is liable for the unseaworthy condition of the vessel.

FAULT
The following questions are interrelated. Was the vessel unseaworthy? Was plaintiff contributorily negligent? Was Best negligent under the Jones Act? The trial judge found that the handrail which caused plaintiff to fall was defective and that the vessel was unseaworthy due to the defective handrail. He also determined that plaintiff was not contributorily negligent and that Best was negligent under the Jones Act. Texaco and Best assert that the handrail was not defective because plaintiff was not using it for it's intended us, at the time of the accident. As a result, they claim that the vessel was not unseaworthy. They further contend that plaintiff was comparatively negligent because he used an unsafe method to perform his task. As a result, Best contends that it is either not negligent or its negligence should be reduced.
*486 The testimony of all the witnesses agreed that the reason that plaintiff fell was because the welded portion of handrail pipe stanchion disengaged from the metal flooring to which it was attached. The pipe stanchions were four feet high, either one and one-half or one and one-fourth inch round and placed four feet apart. A cable was strung through the top of each pipe and the bottom of the pipe was welded to the flat surface of the rig floor, which was approximately fifteen feet above the deck of the barge. When it was inspected after the accident, it was determined that the pipe broke loose when plaintiff put his weight on it and that the weld was still attached to the pipe. Thus, the fall occurred because the weld failed.
Darryl Brewer, President of Best, testified that one of his workers would have instructed the welder to construct the handrail in a particular area, but would not have told him how to do so. He thought it had been constructed the day of the accident. He contended that the weather on that day was overcast, but it was not raining. Brewer asserted that he did not know who told Trout to weld the pipe onto the beam, but said that it would have been a Best employee because the welder would not normally do that on his own. Brewer testified that the handrail was the type used in the past. He stated that he did not inspect the handrail before the accident.
Frank Carroll, the mechanic and shop foreman on the rig, agreed with the testimony of Brewer. He added that the handrail would have been designed by himself, Brewer or Johnny Womack, the Best toolpusher. He also noted that the weld failed because it lacked penetration and that, had the weld penetrated the floor properly, it would have held plaintiff's weight.
Womack testified that he did not see the accident, but was informed about it later. He stated that the handrail was ordered to be put on the "strongbacks" to keep people from falling off the raised platform. He said that he had seen handrails like this type in the past and that it was better than a rigid type, even though rigid handrails are stronger. Womack testified that a post and cable rail was easy to move and quick to rig up and down, which might be necessary if the rig had to be moved a few feet. He further stated that welders avoid welding in bad weather because they can get shocked and that, to his knowledge, no one made Trout weld in the rain. However, he was unable to recall what the weather was like when the welder constructed the handrail. Womack also said that Trout never complained about the welding equipment. Plaintiff testified that he assisted the welder in installing the handrail by running the cable through the pipe and securing the cable. He agree with Womack and Carroll that the handrail was intended to keep workers from falling off the rig onto the barge deck.
Trout testified that he was instructed to construct the handrail as an emergency measure to keep workers from walking off the rig. He stated that the Best driller designed the railing and told him to take the pipe pieces, put a hole in the top, weld it to the structure and then pass a chain through it. He said that it was not a regulation handrail. Trout testified that he was forced to work in the rain. He used a tarp to wrap his lead while he worked and claimed that the weather was bad due to the incoming storm. He said that the winds were 25-30 miles per hour. Trout contended that it would have been no use to complain about working in the rain because there is a saying in his business that "It never rains in the oilfield." So he did as he was instructed. Trout knew when he constructed the rail that the welds were not the best because of the weather. It was his understanding that the handrail was temporary and he asserted that the pipe was not designed to be leaned against.
Plaintiff and Carroll testified to the events surrounding the accident. They stated that the workers were preparing the rig for the coming storm by tying equipment down with cables. Plaintiff stated that he walked to the edge of the platform to receive a coil of cable from Carroll who was standing on the barge floor. Plaintiff unhooked a gate chain that was placed across a gap in the handrail in an area that would have to be kept open during operations. He stated that he knelt down and placed his left hand on the pipe stanchion of the railing and held his other *487 hand out to catch the coil of cable that Carroll threw up to him. As he leaned out slightly, the railing broke and plaintiff fell to the deck. Plaintiff testified that the pipe just came off in his hands. He did not think he lost his balance first, but that he lost it after the pipe broke. Carroll stated that plaintiff fell when the pipe came loose. He thought that plaintiff lost his balance when he reached out. Carroll stated that plaintiff grabbed the pipe with two hands and that the pipe broke resulting in the fall. Carroll testified that he tried to catch plaintiff. As he did so, the weight of plaintiff falling on him pinned his arm to a fuel tank with some force. Both Carroll and plaintiff agreed that there were other ways they could have transferred the cable, such as walking up or down the stairway. They said that plaintiff lost consciousness for a few minutes after the fall. After he regained his senses, he was able to walk to gather his belongings, afterwhich he was taken from the barge to the hospital.

I. Factual Determination of Unseaworthiness
The evidence shows that the welding was defective and that the defect caused the pipe to come loose when plaintiff placed some weight on it. The evidence also shows that all of the workers who testified, including the witness who ordered the railing to be constructed, believed that the handrail was designed and constructed to prevent a worker from falling from the rig to the barge deck. That was the purpose of the railing. Thus, we find that the trial judge was not manifestly erroneous in determining that the handrail was defective. Further, plaintiff was holding the pipe of the railing in order to prevent himself from falling. Thus, he was using it for its intended purpose. Since the vessel was not reasonably fit and safe for its intended purpose, the vessel was unseaworthy. Youn, 605 So.2d at 198. Thus, we find that the trial judge was not clearly wrong in finding that the defect caused the ship to be unseaworthy.

2. Comparative Negligence
Comparative negligence applies in both Jones Act and unseaworthiness actions. Miles v. Melrose, 882 F.2d 976 (5th Cir.1989); Cormier v. Cliff's Drilling Co., 93-1260 (La.App. 3rd Cir. 5/4/94), 640 So.2d 552, 556. Defendant has the burden to prove that plaintiff was contributorily negligent and that plaintiff's negligence was a proximate cause in the injury. Miles, 882 F.2d at 984; Cormier, 640 So.2d at 556-557.
The evidence shows that the plaintiff and Carroll had other options to transfer the cable. However, a seaman is not required to find the safest way to perform his work. Youn, 605 So.2d at 198. Only when he chooses an unsafe method, when he knew or should have known that there was a safe method to do the work, should his action be considered in determining whether he was negligent. Id. Here, plaintiff choose an expedient, but not necessarily unsafe, method to catch the cable. Notably, the workers were concerned about the coming storm. Under these facts, we find that the trial judge did not err in refusing to find the plaintiff comparatively negligent.

3. Jones Act Negligence
Under the Jones Act, 46 U.S.C.App. Sec. 688, the seaman is provided a cause of action against his employer for damages he has suffered in the course of his employment as a seaman. The action is only against his employer. Youn, 605 So.2d at 200. The general principles of negligence apply to the determination of maritime negligence. See: Uncle Ben's v. Hapag-Lloyd Aktiengesellschaft, 855 F.2d 215, 217 (5th Cir.1988). The Jones Act employer is deemed negligent if he fails to exercise reasonable care to maintain a reasonably safe work environment. id; Youn, 605 So.2d at 198. The burden of proof of Jones Act negligence is feather light and only the slightest degree of negligence is sufficient to impose liability on the Jones Act employer. Alverez v. J. Ray McDermott & Co., 674 F.2d 1037, 1042 (5th Cir.1982); Youn, 605 So.2d at 198.
In this case, the evidence shows that Best, the Jones Act employer of plaintiff, designed the handrail, but failed to inspect it. There was contradictory testimony as to whether it was raining when the welder constructed *488 the handrail and whether the Best supervisor allowed the welder to weld in the rain. The testimony showed however, that a wet weld is not as strong as it should be. At any rate, the fact that Best ordered the handrail to be constructed in the manner in which it was constructed and failed to inspect it is sufficient to find it negligent under the Jones Act. Therefore, we find that the trial judge did not err in finding Best negligent under the Jones Act.

ALLOCATION OF FAULT
The trial judge found Texaco 20% at fault, Best 40% at fault and Sigma 40% at fault. After reviewing the record, we find no manifest error in the trial judge's allocation of fault.

INTERVENTION
Liberty Mutual Insurance Company filed an intervention to recover workers compensation benefits which it paid to plaintiff. Plaintiff argues that these benefits were actually maintenance and cure, which are not recoverable by the employer or employer's insurer. Alternatively, plaintiff asserts that the recovery was waived pursuant to the insurance policy.
A maritime employer or insurer who pays an employee workers compensation benefits under the Longshoremen and Harbor Workers Compensation Act, is entitled to recover the amount of the benefits which it paid to plaintiff from the proceeds of any judgment against a third-party or the vessel itself. Cortez v. Total Transportation, Inc., 577 So.2d 292, 296 (La. 5th Cir.1991). It is considered a lien on the worker's recovery, not a claim against the insured. Id. However, where the insurer has provided in the policy a waiver of its subrogation rights, the waiver applies against the proceeds of the seaman or worker's action against the third party tortfeasor or the vessel and the insurer cannot recover the benefits which it has paid to plaintiff. See: Allen v. Texaco, 510 F.2d 977, 981 (5th Cir.1975).
In this case, the intervenor insured Best, the rig owner and the seaman's employer, for various types of risks. Included are longshoremen and harbor workers compensation. Although the company also insured Best for maintenance and cure, there was no objection to a trial stipulation that the intervenor was entitled to pursue the claim. Thus, we conclude that the payments were workers compensation benefits. However, the policies also contained a "Waiver of Our Right To Recover From Others Endorsement". That provision states:
We have the right to recover our payments from anyone liable for an injury covered by this policy. We will not enforce our right against the person or organization named in the Schedule ...
Schedule
All persons or organizations that are parties to a contract that requires you to obtain this agreement, provided you executed the contract before the loss.
The Master Services Agreement that Best and Texaco operated under contained a provision that required this waiver. In addition, the Master Services Agreement applies to all subcontractors that are employed by Best. According to the policy and the Allen case, the intervenor is not entitled to recover the amount of the benefits because the waiver applies to Best (a party to the contract with Texaco), Sigma (the subcontractor) and Texaco (the party requiring the waiver). See: Id. Since the waiver applies to plaintiff's proceeds from all three defendants, the trial judge did not err in dismissing the intervention.

DAMAGES
Defendants assert that plaintiff failed to prove that he will incur future medical expenses. Plaintiff asserts the trial judge did not abuse his discretion in awarding future medical expenses and that the award for general damages should be increased.
The medical evidence shows that, following plaintiff's fall, he was taken to a local hospital where he remained for one week. He testified that his arm, back and legs hurt, and that he experienced some internal bleeding. Plaintiff was diagnosed with 20% compression fractures of two vertebrae. When he was discharged, plaintiff was fitted with a T-brace in the middle of his back, to hold his *489 back rigid. Dr. Del Walker, an orthopedic surgeon treated him for this condition. He also saw a urologist for the bleeding for a few weeks.
Plaintiff contends that Dr. Walker stated that the fractures would heal, but that he would have some disability. Dr. Walker referred plaintiff to Dr. Donald Judice for a second opinion, because he was experiencing pain. Dr. Walker treated plaintiff until February 13, 1989, at which time he was discharged for work. Neither Dr. Walker nor Dr. Judice found a herniated disc at that time. Plaintiff testified that he still experienced pain in the upper and lower back and numbness in his leg. Because Dr. Walker released him despite his continuing discomfort, he sought treatment from an orthopedic surgeon, Dr. Bruce Razza, who indicated that there was a disc problem and plaintiff should consider surgery. Plaintiff discontinued his treatment with Dr. Razza because Dr. Razza appeared to be too busy and cancelled some appointments. Plaintiff then went to Dr. Charles Billings, another orthopedic surgeon. Plaintiff testified that he was having back pain, stiffness, swelling, muscle spasms, leg numbness and arm discomfort. He said that Dr. Billings told him that he was going to eventually have to have surgery on the disc or discs when the pain becomes intolerable. He has opted to continue with pain medication and muscle relaxants, which he takes four times per day.
Plaintiff testified that he has not worked since the accident. Although he feels that he can still do some type of work, his back bothers him almost every day. He stated he has unsuccessfully tried to obtain disability benefits. Plaintiff explained that the pain is unpredictable and is worse on some days than others. He is able to walk about one and one-half miles and he can drive his car most of the time. He lives twenty miles from McComb, Mississippi. Plaintiff stated that he can do a little housework and sometimes is able to cut his one acre yard with a riding mower. However, he testified that his wife and children help and that he cannot do it all at one time. Plaintiff said that he has trouble sitting, that he can only sleep on one side, that his wife helps him wash his hair and sometimes has to assist him out of the shower. Plaintiff testified that his hobbies have changed. Since the accident, he can only go fishing occasionally. He stated that he can neither water ski or ride horses anymore. However, he is able to hunt three to four times per week from either his truck or from a little stand a few feet up in a tree. Plaintiff stated that he does not dress the deer he kills for food, but the other hunters do so for him. Plaintiff testified that the tree stand contains a lawn chair for his comfort. He noted that he lives next to a five thousand acre hunting lease, so he does not have to drive far to go hunting.
Dr. Razza testified that he saw plaintiff on four occasions from March 1989 to February 1990. He stated that plaintiff was suffering from neck, thoracic and low back pain and pain in his right leg, knee and calf. He initially had left leg pain, but that was replaced by worsening right leg discomfort. Dr. Razza had copies of Drs. Walker and Judice's reports and a copy of a CAT scan performed on plaintiff. He stated that the vertebrae were compressed more in the front than the back causing a slight bend forward. The exam showed a mild tenderness of the neck, mild restricted motion, no obvious spasm, tenderness in the mid to lower thoracic area and a mild spasm in the low back. The CAT scan was negative. He determined that plaintiff had a degenerative minor facet spur at L5-S1 and a partial disc rupture at L-5 without nerve impingement. He testified that this was compatible with chronic back pain complaints.
Dr. Razza treated plaintiff conservatively with anti-inflammatory drugs, heat and muscle strengthening exercises. His complaints remained the same, but the spasms would come and go, which was natural to the condition. The doctor felt that plaintiff's on-going symptoms were due to post-traumatic arthritis associated with the vertebrae injuries. He was given restrictions on lifting, bending, squatting, stooping and climbing. He was told to avoid overhead work and to limit sitting or standing to a maximum of one hour. Dr. Razza stated that plaintiff was disabled from physical labor, but could return to some type of work which would conform *490 with the restrictions. Dr. Razza explained that the fractures would normally heal in three to six months, but if the disc and join were also injured, those do not always heal. He testified that the pain continued because the adjacent disc and joints which were also injured, did not heal and developed arthritis. He noted that the herniation could have existed prior to the accident, but that the injury could have caused an asymptomatic herniation to become symptomatic.
Dr. Charles Billings testified that he examined plaintiff for the first time on September 14, 1990. On November 20, 1990, a magnetic resonance imaging (MRI) test revealed a disc herniation at L-5/S-1. He treated the condition conservatively. However, plaintiff has continued to suffer from the complaints of pain. Another MRI in May 1993 confirmed the diagnosis and Dr. Billings concluded that plaintiff is suffering from some nerve impingement. He agreed with the restrictions put on plaintiff by Dr. Razza and stated that plaintiff can return to sedentary work. Dr. Billings asserted that the complaints immediately following the accident are consistent with a lumbar spine injury. He gave plaintiff a disability rating of 15% permanent, partial physical impairment of the lumbar spine, which he stated was caused by the accident.
Dr. Billings testified that there will be some further progression of the impingement over time. He stated that plaintiff has reached maximum medical improvement. The doctor said that surgery was explained to plaintiff as an option, but that he did not push it because plaintiff is coping at present. However, Dr. Billings testified that plaintiff is a candidate for surgery. He further stated that the surgery would entail a single level fusion and would require five to seven days in the hospital. Dr. Billings stated that half of patients who are candidates for surgery, elect the surgery at some point in the treatment. The surgery would not improve plaintiff's physical impairment, but would relieve his pain. Dr. Billings testified that his fee for the surgery, in present dollars, would be $4,000.
Both Drs. Walker and Judice testified. Their testimony indicated that the tests did not show a herniated disc. However, their testimony basically agreed with the other testimony of plaintiff's complaints.
Plaintiff is entitled to an award for future medical expenses. However, plaintiff must prove that it is more probable than not that the expenses will be incurred. Blanchard v. Means Industries, Inc., 635 So.2d 288, 292-293 (La.App. 5th Cir.1994); Youn, 605 So.2d at 204-205.; Whatley v. Regional Transit Authority, 563 So.2d 1194, 1203 (La. App. 4th Cir.1990); writ denied, 569 So.2d 965 (La.1990). Furthermore, in the Louisiana Supreme court opinion reversing Youn in part, the court reaffirmed that the reviewing court is limited in a review of the damage award to a finding that the trier of fact abused its "much" discretion. Youn v. Maritime Overseas Corporation, 623 So.2d 1257, 1260 (La.1993). Only when an abuse of discretion is found, may the court resort to a review of prior awards and then, only to determine the highest or lowest point which is reasonably within the trial court's discretion. Id. The court noted that "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or decrease the award." Youn, 623 So.2d at 1261.
In this case, the evidence by Dr. Billings shows that plaintiff will suffer an increased level of pain over time. Given plaintiff's activity level and historical complaints, we conclude that plaintiff has borne his burden of proving, by a preponderance of the evidence, that he will elect to have the surgery in the future when he can no longer tolerate the pain. Thus, we find that the trial judge did not abuse his discretion in awarding plaintiff $10,000 damages for future medical expenses.
In regard to the general damages award of $150,000, we likewise find no abuse of the trial court's discretion. While clearly disabled to some degree, plaintiff is not so incapacitated with pain that he cannot continue to enjoy some of his previous activities. *491 As the court stated in Youn, "Reasonable persons frequently disagree about the measure of general damages in a particular case." Id. It is only when the award goes beyond what the reasonable factfinder would have awarded should the award be modified. Youn, 623 So.2d at 1261. Here, we cannot say that the trial judge abused his discretion in the award of general damages.

PRE-JUDGMENT INTEREST
Texaco and Best assert that the trial judge erred in awarding pre-judgment interest. Pre-judgment interest on a maritime claim is governed by general maritime law. Mayo v. Nissan Motor Corp. in USA, 93-852 (La.App. 3rd Cir. 6/22/94), 639 So.2d 773, 789. Under federal maritime law, pre-judgment interest is not awarded in a Jones Act claim tried before a jury. Mihalopoulos v. Westwind Africa Line, Ltd., 511 So.2d 771, 781 (La.App. 5th Cir.1987). However, when the claim of unseaworthiness and a claim under the Jones Act are tried together before a judge, the award of pre-judgment interest is discretionary. Youn, 605 So.2d at 204; Mihalopoulos, 511 So.2d at 781. When pre-judgment interest is awarded, the rule under general maritime law is that pre-judgment interest is awarded from the date of loss. Mayo, 639 So.2d at 789; Corliss v. Elevating Boats, Inc., 599 So.2d 434, 438 (La.App. 4th Cir.1992). It is not generally allowed on future unaccrued damages. Youn, 605 So.2d at 204; Mihalopoulos, 511 So.2d at 781. Under maritime law, interest on future damages is awarded from date of judgment. Youn, 605 So.2d at 204; Mihalopoulos, 511 So.2d at 781.
In this case, the trial judge awarded pre-judgment interest on the entire award from date of judicial demand. Because the maritime claim and Jones Act claim were tried together before a judge, we find that the award of pre-judgment interest is discretionary and we find that the trial judge did not abuse his discretion in awarding pre-judgment interest. However, the trial judge should have awarded pre-judgment interest from date of loss and he erred in awarding pre-judgment interest on the future damages.
In oral reasons for judgment, the trial judge divided the award as follows: $125,000 for past and future wages, $150,000 for pain and suffering, $5,081.29 for past medical expenses and $10,000 for future medical expenses from date of judicial demand. However, we are unable to determine from the evidence which portion of the wage award that is attributable to future wages. Therefore, we affirm the interest on the award for past and future wages from date of judicial demand, but modify the award of interest on future medical expenses ($10,000) to be calculated from the date of judgment. We further order that interest on the remainder of the award will accrue from the date of the accident. ($125,000 for wages, $150,000 for pain and suffering and $5,081.29 for past medical expenses, totalling $280,081.29).

INDEMNITY
Texaco asserts that it is entitled to indemnity from Sigma under maritime law because it is a "non-negligent tortfeasor". Best contends that it is entitled to either indemnity or contribution from Sigma because its negligence is less than that of Segma because its negligence is passive.
The principles of indemnity and contribution are related but distinguishable. The principle of indemnity permits one tortfeasor to recover all of its losses from another tortfeasor, provided that the latter "should appropriately answer for the loss." Hardy v. Gulf Oil Corp., 949 F.2d 826, 829-830 (5th Cir.1992). Under the concept of contribution, each tortfeasor pays the proportion of the damages that is attributable to its actions. Id. In maritime matters, the courts have severely restricted the applicability of indemnity to those defendants who are vicariously liable, to non-negligent tortfeasors, to "Ryan doctrine" defendants and to cases of contractual indemnity. "Non-negligent tortfeasors" are those "on which the law imposes responsibility even though they committed no negligent act" Hardy, 949 F.2d at 833. Under the Ryan doctrine, indemnity is permitted where a vessel owner "by entrusting his vessel to a contractor who rendered the vessel unseaworthy, has been subject to absolute liability without directly contributing to the *492 unseaworthy condition that caused the accident." Bass v. Phoenix Seadrill/78, Ltd., 749 F.2d 1154, 1168 (5th Cir.1985).
Texaco contends that it is a non-negligent tortfeasor because its liability is for unseaworthiness, which is fault without negligence. Furthermore, the defective handrail which caused the injury was created by Sigma and Texaco had no part in the creation of the defect. We agree in principle, but a review of the record shows that Texaco failed to assert a third-party action, cross-claim or petition against Sigma. It only claimed, by pleading, indemnity from Best. Since we find no pleading asserting Texaco's claim for indemnity against Sigma, the trial judge did not err in denying Texaco's request for indemnity against Sigma.
In addition, Best is not entitled to indemnity or contribution either. Best was found equally at fault with Sigma. It is responsible for its proportion of fault. See: Hardy, 949 F.2d at 830. Furthermore, the maritime law no longer recognizes the right of indemnity or contribution according to the passive versus active negligence of the tortfeasors. Hardy, 949 F.2d at 834, n. 13. Even if it still did recognize and apply indemnity or contribution according to passive versus active negligence, the facts show, as we have previously found, that the negligence of Best was not passive. According to the testimony, the Best employees designed the handrail for the purpose of preventing workers from falling, instructed Trout how to construct the handrail and failed to inspect the handrail to determine if the handrail was constructed properly. Therefore, the trial judge did not err in denying Best's action for contribution or indemnity from Sigma.
Accordingly, the judgment of the trial judge is hereby affirmed in part as to the liability of the parties. It is reversed as to the liability of Best for unseaworthiness of the vessel. The award of damages, the denial of the intervention, the denial of the indemnity claims and the award of interest on the damage award for past and future wages from date of judicial demand is hereby affirmed. Further, we amend the award of interest on future medical expenses ($10,000) and order that interest on future medical expenses are be calculated from the date of judgment. Also, we amend the judgment to order that interest on the remainder of the award, in the amount of $280,081.29, ($125,000 for past and future wages, $150,000 for pain and suffering and $5,081.29 for past medical expenses), will accrue from the date of the accident, instead of date of judicial demand. The judgment is otherwise affirmed.
AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART AND AFFIRMED AS AMENDED.

ORDER GRANTING REHEARING IN PART
In our original opinion, we discuss how interest on damages is awarded under maritime law. Because we could not determine which portion of the lost wages ($125,000) was attributable to past and future wages, we affirmed the award of interest from date of judicial demand. We then erroneously included that amount in the order to calculate interest on past damages from date of the accident. We also ordered interest on the award for pain and suffering ($150,000) to accrue from the date of the accident, although the trial judge did not divide this amount into past and future damages either. These are inconsistencies in our opinion. Thus, we vacate that portion of the judgment awarding judicial interest for lost wages and for pain and suffering.
In their application for rehearing, defendant, Texaco, Inc., asks that we either remand the case to the trial judge for the purpose of dividing the damages into past and future lost wages and past and future pain and suffering and to award interest in conformity with maritime law. Alternatively, defendant requests that we divide those items of damages into past and future damages and recalculate the interest.
Because the trial judge is in the best position to make this determination, we remand the case for the limited purpose of dividing the awards for lost wages and for pain and suffering into past and future damages and to award interest on those items of damages *493 in conformity with maritime law, in accordance with our original opinion.
Accordingly, we vacate our judgment insofar as it affirms the trial court award of judicial interest on lost wages ($125,000) from date of judicial demand and insofar as it also awards interest on lost wages from the date of the accident. We further vacate our judgment insofar as it awards judicial interest on pain and suffering from the date of the accident. Our original judgment is otherwise affirmed.
NOTES
[1] Best went out of business in 1990.