732 So.2d 93 (1999)
Joseph Marion "Bobby" FRANICEVICH
v.
CAILLOU ISLAND TOWING COMPANY, INC., certain underwriters at Lloyds of London and ABC Insurance Company.
No. 97-CA-1887.
Court of Appeal of Louisiana, Fourth Circuit.
March 17, 1999.
*94 Scandurro & Layrisson, L.L.C., Stephen O. Scandurro, Timothy D. Scandurro, Jean-Paul Layrisson, New Orleans, Louisiana, Attorneys for Plaintiff/Appellant.
Elton F. Duncan, III, Richard E. Jussaume, Jr. New Orleans, Louisiana, Attorneys for Defendant/Appellant.
Rufus C. Harris, III, Alfred J. Rufty, III, New Orleans, Louisiana, Attorneys for Defendant/Appellee.
Court composed of Judge STEVEN R. PLOTKIN, Judge CHARLES R. JONES, and Judge Pro Tempore PHILIP C. CIACCIO.
JONES, Judge.
Plaintiff/appellant, Joseph Marion "Bobby" Franicevich, appeals the judgment of the trial court granting an involuntary dismissal in favor of Caillou Island Towing Company at the conclusion of plaintiff's case-in-chief. After a review of the record, we affirm the trial court's judgment.

FACTS
On October 19, 1993, Thermal Remediation (Thermal) executed a contract with Chevron Pipeline Company (Chevron) to remediate and close some of Chevron's waterpits located in Chevron's West Delta 30 Tank Battery. To assist in the operation, Thermal chartered a tug named the WILTON P. LeBOUEF, and a spud barge named the MISS MICHELLE, both of which were owned by Caillou Island Towing Company, Inc. (Caillou).
The agreement to charter the barge and the tug was not reduced to writing; instead, the charter agreement was oral and perfected between a representative from Caillou and a representative from Thermal. Thermal used the spud barge as a work platform throughout the course of their project. Because the barge was not a self-propelled vessel, Thermal's employees would periodically request that Caillou's employees use the WILTON P. Le-BOUEF to move the barge to various locations.
On February 16, 1994, the MISS MICHELLE was docked in Buras, Louisiana at Joshua's Marina, which was owned by the appellant, Joseph "Bobby" Franicevich (Franicevich). Earlier that day, the barge had been spudded down at the West Delta 30 Tank Battery and had been towed to *95 Joshua's Marina by the WILTON P. Le-BOUEF. Thermal's employees asked Mr. Franicevich and other individuals at the marina to come on board the MISS MICHELLE to remove a number of acetylene tanks from the deck of the MISS MICHELLE. As Mr. Franicevich walked along the deck of the barge, he slipped on a grayish, mud-like substance and fell to the deck, injuring his neck, mid-back and elbow.
Mr. Franicevich filed suit against Thermal, Caillou, and their respective insurers. He claimed that Caillou, as owner of the barge, was responsible for the presence of mud on the deck, establishing a theory of recovery under unseaworthiness and negligence. Trial commenced in this matter on October 29, 1996. At the conclusion of the trial, the court rendered its judgment in favor of Mr. Franicevich in the amount of $251,002.64, and against Thermal and its insurers. The trial court also granted Caillou's motion for involuntary dismissal. The trial court reasoned that Thermal not Caillou knew or should have known of the mud-like substance on the deck of the MISS MICHELLE, and that their failure to remove that substance created the unreasonable risk of harm. Thermal and its insurers took a suspensive appeal of the judgment, but later settled with Mr. Franicevich while the appeal was pending. Following settlement, Thermal and its insurers assigned their rights to contribution and indemnity against Caillou to Mr. Franicevich, who now pursues this appeal.

STANDARD OF REVIEW
In appellant's lone assignment of error, he argues that the charter agreement was a time charter because Caillou retained navigational command and authority over the vessel. He further argues that the spud barge and the tug acted as a flotilla: the spud barge and the tug were negotiated at the same time and under the same terms. Additionally, Mr. Franicevich argues that Caillou bears the burden of proving what type of charter was negotiated, and he argues that Caillou's burden of proof has not been satisfied. Finally, Mr. Franicevich argues that because the facts so clearly demonstrate the existence of a time charter, the trial court erred in granting Caillou's involuntary dismissal.
LSA-C.C.P. art. 1672(B) provides that any party in a bench trial may move for an involuntary dismissal if it is shown that the plaintiff is not entitled to relief once he has presented his evidence. In making the motion, the movant does not waive his right to put on evidence if the motion is not granted, and the trial court may elect to delay rendering its judgment until the close of all evidence. Id. The motion should be granted if the plaintiff failed to establish his claim by a preponderance of the evidence. Gagliano v. Amax Metals Recovery, Inc., 96-1751, 96-1752 (La.App. 4 Cir. 5/7/97), 693 So.2d 889, 890, writ denied 97-1738 (La.10/13/97), 703 So.2d 619. The Motion for Involuntary Dismissal is reviewed under the manifest error standard of review. See Haworth v. L'Hoste, 95-0714 (La.App. 4 Cir. 11/30/95), 664 So.2d 1335, writ denied 96-0408 (La.3/29/96), 670 So.2d 1235. Therefore, it is incumbent upon this Court to determine whether Mr. Franicevich satisfied his burden of proof against Caillou in his case-in-chief, and whether it was proper for the trial court to grant Caillou's Motion for Involuntary Dismissal at the close of all evidence.

STATUS OF THE CHARTER
In the case sub judice, the central issue is whether the plaintiff proved by a preponderance of the evidence that the charter agreement entered into by representatives for Caillou and Thermal was a "bareboat" charter or a "time" charter.
In Olivier v. Best Workover, Inc., 94-994 (La.App. 5 Cir. 1/30/96), 669 So.2d 476, our brethren at the Fifth Circuit addressed the distinction between a bareboat charter and a time charter as used in the instant matter. In Olivier, the plaintiff, an *96 oil field worker, filed suit against his employer under the Jones Act and general maritime law for injuries he sustained when he fell from a drilling rig to the deck of the barge on which the rig was mounted. The plaintiff also filed suit against Texaco, the owner of the barge. In finding the barge owner liable for the injuries sustained by the plaintiff, the trial court determined that even though the plaintiff's employer was hired to perform a specific job, Texaco did not relinquish control of the vessel. Therefore, both the vessel owner and the charterer were liable because while one retained control of operations, the other controlled the vessel. Olivier, 669 So.2d at 485.
In order to create a bareboat charter, the owner must completely and exclusively relinquish "possession, command and navigation" of the vessel to the charterer. Agrico Chemical Co. v. M/V Ben W. Martin, 664 F.2d 85, 91 (5th Cir.1981); Backus[Backhus] [v. Transit Cas. Co., 532 So.2d 447], at 449 [(La. App. 1 Cir. 1988)]. The bareboat charter is "just short of, an outright transfer of ownership." (Citations omitted). It need not be in writing and control is the critical issue to determine whether a bareboat charter exists. (Emphasis added).
Id.
Also, under a bareboat or "demise" charter, the vessel is transferred without a crew, provisions, fuel or supplies hence the name "bareboat." See Walker v. Braus, 995 F.2d 77, 81 (5th Cir. 1993). Additionally, a charterer in a bareboat charter must also supply operating expenses; the personnel to operate and man the vessel, and he has liability for any and all casualties resulting from such operation; thus, it is necessary that he provide insurance for the vessel being chartered. Id.
However, unlike bareboat charters, a time charter releases the vessel for a fixed period, and the vessel owner retains possession and control of the vessel in question; provides whatever crew is needed and is responsible for normal operating expenses. Furthermore, in a time charter, the owner fully equips and maintains the vessel, makes repairs as needed and provides insurance on the vessel. Id; see also Cantrelle v. Kiva Const. & Engineering, Inc., 630 So.2d 265, 273 (La.App. 1 Cir.1993).
The record reflects and supports the trial court's decision to classify the charter agreement between Caillou and Thermal as a bareboat charter. William Cenac, a Caillou representative, and Elliot Crochet, a Thermal representative entered into the charter agreement. At trial Mr. Cenac testified that the charter of the barge was a "bare bones charter" which included nothing more than the supply of a spud barge. Mr. Cenac further testified that Caillou did not furnish a captain or crew with the MISS MICHELLE. In essence, Mr. Crochet requested an available barge and the daily rate for that barge. Mr. Cenac provided Thermal with one of their available barges and stated that "[Thermal] had control of it." Mr. Cenac further testified that provisions for a captain or a crew were not negotiated between Caillou and Thermal.
Mr. Crochet testified that the barge was operated and manned solely by Thermal employees throughout the dredging operation. The movement of the barge was determined solely by Thermal, and tugboats other than the WILTON P. Le-BOUEF would move the barge to various locations specified by Thermal. More importantly, Mr. Crochet testified that Thermal was responsible for cleaning the MISS MICHELLE, and the evidence also established that Thermal maintained marine protection and indemnity insurance on the MISS MICHELLE during the term of the charter. See Gaspard v. Diamond Drilling Co., 593 F.2d 605, 606 (5th Cir.1979). Hence, we find that the charter agreement between Caillou and Thermal was a bareboat, demise charter. We also pretermit *97 any discussion of the plaintiff's claim for unseaworthiness of the MISS MICHELLE.
In the alternative, Mr. Franicevich argues that the charter should be classified as a time charter because the WILTON P. LeBOUEF periodically moved the MISS MICHELLE. We disagree.
Both Mr. Cenac and Mr. Crochet testified that any towage of the MISS MICHELLE was done at the request of Thermal's employees who exclusively manned this vessel at all relevant times. The testimony further established that when the WILTON P. LeBOUEF was not transporting the spud barge it would leave to perform other jobs. Furthermore, there was also evidence that the tug would periodically move other vessels at Thermal's direction; meanwhile vessels other than the WILTON P. LeBOUEF would occasionally move the MISS MICHELLE.
"[W]hen there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error." Fuge v. Uiterwyk, 94-1815 (La.App. 4 Cir. 3/29/95), 653 So.2d 707, 713. "The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts." Id. at 714, (citing Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973)).
We find that the evidence and testimony presented in the case sub judice provides a reasonable factual basis for the trial court's judgment that Caillou bore no responsibility for plaintiff's injuries. Further, the testimony showing that the WILTON P. LeBOUEF sporadically moved the MISS MICHELLE to miscellaneous locations at the request of Thermal does not establish liability on the part of Caillou.

DECREE
For the reasons stated herein, we affirm the judgment of the trial court granting an involuntary dismissal in favor of Caillou Island Towing finding that Caillou bore no liability for the injuries sustained by Joseph Marion "Bobby" Franicevich on February 16, 1994.
AFFIRMED.